731 A.2d 467

## In re ADOPTION/GUARDIANSHIP NO. 6Z970003 in the District Court for Montgomery County.

No. 1119, Sept. Term, 1998.

Court of Special Appeals of Maryland.

June 23, 1999.

Darlene A. Wakefield, (Ullmann & Wakefield, P.A., on the brief), Baltimore, for Appellant.

C.J. Messerschmidt, Assistant Attorney General, (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before MOYLAN, DAVIS, and BYRNES, JJ.

BYRNES, Judge.

In the District Court for Montgomery County, sitting as the juvenile court, the Montgomery County Department of Health and Human Service's (DHHS), appellee, petitioned for guardianship with the right to consent to adoption or long-term care short of adoption of Justus K., appellant.[1] The petition, which was not contested by Justus's only surviving parent, was granted without a hearing.

Justus, who is twelve years old, challenges the guardianship order on appeal. He raises two questions, which we have reordered and rephrased:

I. Did the juvenile court commit legal error by failing to recognize that it had discretion to grant him a hearing?

II. Did the juvenile court violate his due process rights by denying him an evidentiary hearing on his opposition to the guardianship petition?

For the reasons that follow, we conclude that the juvenile court erred in failing to grant Justus an evidentiary hearing. Accordingly, we vacate the guardianship order and remand the case for further proceedings consistent with this opinion.

## FACTS AND PROCEEDINGS

Justus K. was born on July 7, 1986 to Ingrid K., who was not married at the time and did not name a father on Justus's

---

1. Md.Code (1974, 1998 Repl.Vol.), § 3–832 of the Courts and Judicial Proceedings Article ("C.J."), provides that "[f]or purposes of Title 12 of this article, an action, decision, order or judgment of the District Court in Montgomery County sitting as a juvenile court shall be treated in the same manner as if it had been made, done, or entered by a circuit court." C.J. § 12–403 provides, in pertinent part, that, "[i]n Montgomery County, an appeal from the District Court sitting as a juvenile court shall be as provided for in § 3–832 of this article."

birth certificate. Ingrid K. later disclosed that George W. is Justus's father. George W. did not deny paternity.[2] Until Justus was five years old, he and his siblings lived with Ingrid K. and George W.

On April 7, 1992,. DHHS filed a petition alleging that Ingrid K. was unable to provide minimal care and supervision for Justus and his three younger siblings and asking that they be found to be Children in Need of Assistance (CINA).[3] At that point, Justus was committed to the custody of DHHS and placed in foster care. A month later, on May 6, 1992, Justus and his siblings were adjudicated CINA.

At first, Justus lived in a foster home with one of his sisters. They later were separated. Since mid–1992, Justus has lived in four foster homes. During that time, George W. has had no contact with him.

On November 21, 1994, Justus's mother died of Acquired Immune Deficiency Syndrom (AIDS). Three years later, on November 14, 1997, DHHS filed a petition for guardianship of Justus with the right to consent to adoption or long-term care short of adoption. DHHS alleged that George W. was withholding consent to the termination of his parental rights, contrary to Justus's best interests.

On November 19, 1997, the juvenile court issued a show cause order to George W. at the Washington, D.C. address that was listed for him on the petition for guardianship. When service could not be effected because George W. could not be found at that address or elsewhere, DHHS filed a motion to waive notice, pursuant to Md.Code (1984, 1999

---

**2.** Md.Code (1984, 1999 Repl.Vol.), § 5–301(d) of the Family Law Article ("F.L."), defines "father" to mean "the man who is the birth father of a child under § 5–310 of this subtitle." F.L. § 5–310(a) provides that the "[n]atural father of an individual means a man who: ... (4) is identified by the natural mother as the father of the individual, unless the man signs a denial of paternity or his nonpaternity has been established to the satisfaction of the court by affidavit or testimony[.]"

**3.** The record in this case does not indicate what allegations about George W. were asserted in the petition, if any.

Repl.Vol.), § 5–322(d) of the Family Law Article ("F.L.").
That motion was granted on January 12, 1998.

In the meantime, on December 5, 1997, the juvenile court
appointed counsel for Justus. It did so in accordance with the
established practice of the juvenile court in Montgomery
County in guardianship cases. The attorney who was appoint-
ed to represent Justus was not the same attorney who had
represented him in the CINA proceedings.[4]

On February 23, 1998, DHHS filed a motion for final order
of guardianship of Justus. Through his attorney, Justus filed
a written opposition to DHHS's motion, in which he objected
to the termination of his father's parental rights and requested
that the juvenile court deny the petition for guardianship. He
attached to his opposition a report by his therapist in which
she states that she "cannot readily support a plan for termi-
nation of parental rights, unless the Department has no other
option." Justus requested that DHHS's motion for final order
be set in for an evidentiary hearing.

DHHS did not move to strike Justus's opposition. The
juvenile court scheduled oral argument on the limited question
"whether a hearing should be held on th[e] petition for [termi-
nation of] parental rights." Counsel submitted memoranda of
law. The argument took place on July 9, 1998, soon after
Justus's twelfth birthday. Justus's counsel urged: 1) that the
constitutional requirements of due process dictate that Justus
be given the opportunity to be heard on the petition for
guardianship; 2) that because Justus was not consenting to
the termination of his father's parental rights, the petition for
guardianship was "contested" and therefore a hearing was
required under Md. Rule 9–109(a); and 3) that, even if the
case were "uncontested," the juvenile court had discretion to
conduct a hearing and the proper exercise of discretion re-
quired that it do so.

---

4. As we discuss *infra*, F.L. § 5–322(a)(1)(ii) provides, *inter alia*, that a
 petitioner for guardianship of a child who previously has been found to
 be CINA shall give notice of the petition to the attorney who represent-
 ed the child in the CINA proceeding.

Justus's counsel also proffered for the juvenile court some of the evidence that would be introduced at the sought after hearing. Specifically, she explained that Justus had lived with his father for five years, that he had some memories of George W., most of which were bad, and that he harbored some hope that he and his father would be reunited. In addition, Justus's counsel proffered that his therapist would testify about the basis for her opinion that termination of George W.'s parental rights would not be in Justus's best interest at this time, including her clinical observation that Justus's mental state had deteriorated since the filing of the petition for guardianship.

Counsel for DHHS argued that because Justus's consent was not required for the granting of a guardianship, he had no standing to object and hence no right to be heard. Moreover, because Justus's father had consented to the guardianship, the case was "uncontested," within the meaning of Md. Rule 9–109(a), and therefore a hearing was not required.

After counsel concluded their arguments, the juvenile court granted the guardianship petition without affording Justus a hearing. In doing so, the court noted that "this is really about the parents['] rights, not about the child's rights and that the child that is the subject of a guardianship proceeding does not have the right to consent and thus does not have the right to object." Thereafter, Justus noted a timely appeal.

## DISCUSSION

### I

It will be helpful to preface our discussion of the issues presented with an outline of the pertinent portions of the Maryland statutory scheme for guardianships and adoptions, as set forth in Title 5, subtitle 3 of the Family Law Article and as implemented by Md. Rules 9–101 through 9–113.

As used in subtitle 3 of the Family Law Article, a "guardianship" means "guardianship with the right to consent to adoption or long-term care short of adoption." F.L. § 5–

301(e). Only a minor may be placed under such a guardianship. F.L. § 5–307(b). The executive head of a child placement agency (which includes local departments of social services) or the attorney for a child on behalf of that child may file a petition for the agency to be granted guardianship of the child. F.L. § 5–317(a). No other person or entity may bring a guardianship action. *Id.*

A guardianship decree has the effect, *inter alia,* of terminating each natural parent's rights, duties, and obligations toward the child. F.L. § 5–317(f)(1). Except as set forth by statute, a guardianship decree may be granted only after "any investigation and hearing that the court considers necessary" and only with the consent of each living natural parent of the child. F.L. § 5–317(c). If a natural parent of a child who is the subject of the petition for guardianship refuses to consent, the court may grant the guardianship only upon a finding by clear and convincing evidence that, *inter alia,* it is in the best interest of the child to terminate the non-consenting natural parent's rights to the child. F.L. § 5–313(a).

Notice of a petition for guardianship must be given to each person whose consent is required, which, as explained above, includes each living natural parent of the child. F.L. § 5–322(a). When the child previously has been adjudicated to be CINA and the petitioner has made good faith but unsuccessful efforts to serve the show cause order on a natural parent, the court may waive the requirement of notice to that parent. F.L. § 5–322(c)(3). In that case, the parent is deemed to have consented to the guardianship, and the petition is treated in the same manner as one to which consent has been given. F.L. § 5–322(d).

It is not necessary for a child who is the subject of a guardianship proceeding to consent to it. Accordingly, the child is not a person who is entitled to notice of the petition for guardianship under F.L. § 5–322. If, however, the child has been adjudicated a CINA, a neglected child, or an abused child, notice of the petition for guardianship must be provided to the attorney who represented the child in the juvenile

proceeding. F.L. § 5–322(a)(1)(ii)(1). A child who has reached the age of ten, however, may not be adopted without his consent. F.L. § 5–311(a)(3).

In an adoption case, the court must hold a hearing before entering a final decree. F.L. § 5–324.1. In a "contested" guardianship action, an "on the record" hearing on the merits must be held before the court enters a judgment of guardianship. Md. Rule 9–109(a). In such a hearing, the court must make the findings required by F.L. § 5–313.[5] In an "involun-

---

**5.** The factors that the court must consider in making its findings are set forth in F.L. § 5–313(c):

(c) Required considerations—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration to the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(iv) the child's adjustment to home, school, and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2. if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3. the maintenance of regular communication by the natural parent with the custodian of the child; and

4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

tary termination of parental rights" proceeding, the court must appoint separate counsel to represent the child who is the subject of the proceeding (be it a petition for guardianship or for adoption). F.L. § 5–323(a)(1)(iv).

It is clear that the statutory scheme outlined above does not require that the court conduct a hearing on a petition for guardianship when neither living natural parent has withheld consent, unless the court considers that a hearing is necessary. F.L. § 5–317(c)(1). In this case, Justus's only living natural parent, George W., did not withhold his consent to the guardianship. On the contrary, because he could not be found, notice to him was waived and he was deemed to have consented to the guardianship by operation of law. F.L. § 5–322(d); *In re Adoption/Guardianship No. 93321055/CAD*, 344 Md. 458, 687 A.2d 681 (1997). Because it concluded that Justus's rights were not at stake, the juvenile court found that the hearing that Justus had requested was not necessary, and granted the petition without it.

## II

Justus first contends that the juvenile court committed legal error because it denied him a hearing on the ground that it did not have the discretion to grant him one under the Family Law Article. This contention is not supported by the record. At no time during the oral argument on the question whether to grant Justus a hearing did the juvenile court indicate a belief or understanding that it was without discretion to do so. In fact, the record of the juvenile court's ruling makes plain that the court knowingly exercised its discretion to deny Justus a hearing because it did not consider a hearing to be necessary, in accordance with the standard set forth in F.L. § 5–317(c).

The primary question in this case thus becomes whether Justus has a liberty interest in his filial relationship with his

(vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

father that the State cannot disrupt without due process of law and, if so, whether the process to which Justus is due includes the opportunity to present evidence to the court. If so, the juvenile court did not have discretion to deny Justus the opportunity to present evidence, and erred in denying his request to be heard.

## III

### (a)

Justus contends, as he did below, that his liberty and property interests were at stake in the guardianship proceeding and, therefore, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, he was entitled to at least a minimum of procedural safeguards, including the opportunity to be heard, before the State could deprive him of those interests. DHHS counters that the only constitutionally protected interest implicated by its petition for guardianship was George W.'s parental rights, and that because he had consented to the guardianship, a hearing was not required either under principles of due process or under the guardianship statute.

■ The Fourteenth Amendment provides that no State shall deprive a person of life, liberty, or property without due process of law. U.S. Const. amend. XIV § 1. Among other things, the Due Process Clause affords a right to "procedural due process," that is, a constitutionally required minimum of procedural safeguards, in connection with a deprivation of life, liberty, or property by the State. *Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (Stevens, J. concurring).[6]

---

**6.** The Supreme Court has interpreted the Due Process Clause to include a substantive component that protects some liberty interests from State interference no matter what process is given, unless the infringement is narrowly tailored to achieve a compelling State interest. *See Reno v. Flores,* 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). Justus K. does not argue that his interest in the termination of his father's parental rights is entitled to the substantive protection of the

We must begin our analysis of whether Justus's constitutional right to procedural due process was violated by determining the nature of the private interest that he contends was threatened by the State in the guardianship action. "Only after that interest has been identified, can we properly evaluate the adequacy of the State's process ... We therefore first consider the nature of the interest in liberty for which appellant claims constitutional protection and then turn to a discussion of the adequacy of the procedure that [the State] has provided for its protection." *Lehr v. Robertson*, 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (citing *Morrissey v. Brewer*, 408 U.S. 471, 482–83, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)); *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 838–39, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) ("Our first inquiry is whether [challengers] have asserted interests within the Fourteenth Amendment's protection of 'liberty' and 'property.' ")

 We note, preliminarily, that children are "persons" under the Constitution and possess some constitutional rights. *See e.g. Bellotti v. Baird*, 443 U.S. 622, 633, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) ("[a] child, merely on account of his minority, is not beyond the protection of the Constitution"); *Planned Parenthood v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority"); *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) ("whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone"); *Parham v. J.R.*, 442 U.S. 584, 600, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (child has substantial liberty interest in not being confined unnecessarily for medical treatment). Nevertheless, a child's liberty interests are not identical to those of an adult. The Supreme Court has long recognized the "special needs of children," and thereby justified treating them differently than

---

Due Process Clause. Rather, he argues that he was entitled to procedural due process.

adults. *Bellotti, supra,* 443 U.S. at 634, 99 S.Ct. 3035; *See also, May v. Anderson,* 345 U.S. 528, 536, 73 S.Ct. 840, 97 L.Ed. 1221 (1953) (Frankfurter, J., concurring) (stating that "[c]hildren have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children.").

In this case, the liberty interest that Justus maintains warrants protection in the guardianship proceeding is his filial bond to the natural father with whom he lived until he was five years old but with whom he has had no contact for seven years. "It is an established part of our constitutional jurisprudence that the term 'liberty' in the Due Process Clause extends beyond freedom from physical restraint." *Michael H. v. Gerald D.,* 491 U.S. 110, 121, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion by Scalia, J.). "[T]he Supreme Court has consistently maintained that 'freedom of personal choice in matters of ... family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.'" *Halderman v. Pennhurst State School and Hospital,* 707 F.2d 702, 706 (3rd Cir., 1983) (quoting *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974)). Furthermore, it is well-settled that the parent-child relationship gives rise to a liberty interest in the parent that may not be terminated by the State absent procedural safeguards that allow for fundamental fairness. *See, e.g., Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (holding that statute conclusively presuming that unwed father is unfit to have custody regardless of the actual relationship between father and child violates Due Process Clause); *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (holding that a parent's desire for and right to companionship, care, custody, and management of his or her child is an important interest that warrants deference and protection absent a powerful countervailing interest); *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that a parent has a protected liberty interest in relationship

with child that State cannot sever absent proof of unfitness by clear and convincing evidence).

The United States Supreme Court has not addressed directly the question whether a child's filial bond to his parents is a protected liberty interest under the Due Process Clause. In a case involving the termination of parental rights, the Court made plain, however, that the relationship between parent and child is neither one-sided nor one-dimensional: "The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases." *Lehr v. Robertson,* 463 U.S. 248, 256, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (also observing, *id.* at 258, 103 S.Ct. 2985, that "the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection .").

In a context outside of the termination of parental rights, one federal appeals court has recognized the existence of such a liberty interest. *Smith v. Fontana,* 818 F.2d 1411, 1418 (9th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987) ("[C]onstitutional interest in familial companionship and society logically extends to protect children from unwarranted stated interference with their relationships with their parents. The companionship and nurturing interests of parent and child in maintaining a tight familial bond are reciprocal, and we see no reason to accord less constitutional value to the child-parent relationship than we accord to the parent-child relationship."). *See also Franz v. United States,* 707 F.2d 582, 595 (D.C.Cir.1983) (freedom of personal choice in matters of family life that constitutes a fundamental liberty interest includes "the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship.").

Our analysis of whether Justus K., as a child, has a liberty interest in his relationship with George W., as his father, that is entitled to constitutional protection is best guided by the Supreme Court's plurality decision in *Michael H. v. Gerald D.,*

*supra,* in which the Court assumed, without deciding, that a child "has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship." 491 U.S. at 130, 109 S.Ct. 2333. In that case, Carole D. gave birth to a daughter, Victoria, by Michael H., who was not her husband. When Victoria was conceived and born, Carole was married to Gerald D. Carole listed Gerald as Victoria's father on her birth certificate and Gerald thought that he was Victoria's father. Soon after Victoria was born, Gerald and Carole separated and Gerald moved to another state. Carole, Michael, and Victoria then underwent blood tests that confirmed that Michael was Victoria's biological father. Carole and Victoria took up residence with Michael, who held the child out as his own. Carole later left that arrangement, and she and Victoria moved in with a third man. Subsequently, Carole and Victoria resumed living with Michael for an eight month period, during which he again held Victoria out as his own. Eventually, Carole reconciled with Gerald, with whom she later had two children.

When Carole rebuffed Michael's attempts to visit Victoria, he brought an action in California state court to establish his paternity and right to visitation. Through a guardian ad litem, Victoria joined in Michael's request. Gerald intervened in the action and moved for summary judgment, citing the California statute that provides that a child born to a married man who is not impotent or sterile and who is cohabiting with his wife is conclusively presumed to be the child of the marriage. Gerald argued that under that statute, Michael could not prevail, regardless of whether he could prove that he was Victoria's natural father. The court agreed, and entered judgment in Gerald's favor. On appeal, Michael and Victoria asserted that the California paternity statute violated their substantive and procedural due process rights.

After the California appellate courts affirmed the statute's constitutionality, the United States Supreme Court issued a writ of *certiorari.* Michael argued that the paternity statute was unconstitutional because the requirements of procedural due process prevented the State from terminating his liberty

interest in his relationship with Victoria without affording him the opportunity to present proof of his paternity in an evidentiary hearing. 491 U.S. at 119, 109 S.Ct. 2333. In so asserting, he relied upon Supreme Court cases that he read as holding that a liberty interest in the parent-child relationship is created by "biological fatherhood plus an established parental relationship." *Id.* at 123, 109 S.Ct. 2333. *See Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (holding that biological father has constitutionally protected interest in opportunity to develop a relationship with offspring; if he fails to act on that opportunity, he is not denied due process of law by state adoption statute that did not afford him notice); *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (holding that adoption of child by new husband of child's mother did not violate due process rights of father who had not sought visitation or to legitimate child until adoption proceeding was commenced); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (holding that unwed father who had lived with mother and children for several years had a constitutionally protected liberty interest in relationship with children that could be overcome in adoption proceeding only by showing that State had an equally important interest); *Stanley v. Illinois, supra.*

A plurality of the Court rejected Michael's argument. It reasoned that even though Michael's bond to Victoria not only was biological but also was established by a pattern of parental conduct, those factors were not sufficient to create a liberty interest unless the relationship was one that "has been treated as a protected family unit under the historic practices of our society," or on some other established basis. 491 U.S. at 124, 109 S.Ct. 2333. The plurality concluded that the relationship between a natural father of a child "conceived within, and born into, an extant marital union that wishes to embrace the child . . . is not the stuff of which fundamental rights qualifying as liberty interests are made." *Id.* at 127, 109 S.Ct. 2333 (footnote omitted).

With respect to Victoria's contention that her liberty interest in her relationship with her natural father warranted

constitutional protection, the plurality reasoned that, even assuming that such an interest existed, it would not encompass the right to maintain filial relationships with two fathers, because "multiple fatherhood has no support in the history and traditions of this country." 491 U.S. at 131, 109 S.Ct. 2333. It concluded, moreover, that Victoria's claim to due process protection was "at best ... the obverse of [her biological father's claim] and fails for the same reasons." *Id.* at 131, 109 S.Ct. 2333.

▮▮ As Justice Scalia's plurality opinion in *Michael D.* makes plain, even though "[t]he Constitution protects the sanctity of the family ... because the institution of family is so deeply rooted in this Nation's history and tradition," *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion), whether there exists a protected liberty interest in the parent-child or child-parent bond that the State may not sever without procedural due process is not merely a function of biological or psychological ties, and cannot be ascertained out of context. In addition, "[t]he unique role in our society of the family, the institution by which we inculcate and pass down many of our most cherished values ... requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children." *Bellotti, supra,* 443 U.S. at 634, 99 S.Ct. 3035 (internal quotations and citations omitted). We agree, moreover, with Justice Brennan's observations in *Bowen v. Gilliard,* 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987):

> A fundamental element of family life is the relationship between parent and child.... [The Supreme Court has been] vigilant in ensuring that government does not burden the ability of parent and child to sustain their vital connection. 'The rights of the parents are a counterpart of the responsibilities they have assumed.' When parents make a commitment to meet those responsibilities, the child has a right to rely on the unique contribution of each parent to material and emotional support. *The child therefore has a fundamental interest in the continuation of parental care*

*and support, and a right to be free of governmental action
that would jeopardize it.*

*Id.* at 612, 107 S.Ct. 3008 (quoting *Lehr v. Robertson, supra,* at
257, 103 S.Ct. 2985) (other citations omitted; emphasis sup-
plied).

█ We hold that, in the circumstances of this case, Justus
has a liberty interest in his relationship with his father that
cannot be disrupted without affording him some measure of
due process. George W. and Justus are related by blood and
for the first five years of Justus's life, they lived in one
household in a father-son relationship. The filial bond be-
tween Justus and George is not just biological. It developed
through a pattern of conduct over a period of years and
existed within the framework of a family unit historically
recognized by society. The bond endured long enough for
Justus to form a relationship with his father that he remem-
bers and to develop an emotional tie that has led him to hold
out the hope, whether realistic or not, that George W. will
come back and resume the role of father.

The family in which Justus lived with George W., Ingrid,
and his siblings is the only family that Justus ever knew. The
disintegration of that family was brought about by Ingrid,
most certainly, and by George, most likely—but not by Justus.
Justus's relationship with his father was developed, like those
in *Stanley* and *Caban,* not potential, like those in *Quilloin* and
*Lehr.* Justus had a fundamental interest in the continuation of
that developed relationship. To be sure, the relationship did
not continue. Although years have passed since its existence,
the relationship was developed nonetheless. That obviously
continues to have some emotional value to Justus. The "fun-
damental liberty interest of natural parents in the care, custo-
dy, and management of their children does not evaporate
simply because they have not been model parents or have lost
temporary custody of their child to the State." *Santosky v.
Kramer,* 455 U.S. at 753, 102 S.Ct. 1388. *See also Smith v.
Organization of Foster Families,* 431 U.S. 816, 97 S.Ct. 2094,
53 L.Ed.2d 14 (1977) (natural parents of children placed in

foster care maintain liberty interests in their relationships with their children). Likewise, Justus's developed relationship with his father, with its lasting emotional ramifications, did not evaporate when his father ceased maintaining contact with him. Moreover, unlike the circumstance in *Michael D.*, in which the natural father's relationship with his daughter was viewed by a plurality of the Supreme Court as historically disfavored and as inconsistent with the continuation of her relationship with the "father" in the marriage to which she was born, Justus's relationship to George W. has no effect on any other parental relationship. Indeed, he has no other such relationship.

In this Court, DHHS repeats the argument it made below, and that the juvenile court adopted: that Justus was not entitled to be heard because the guardianship proceeding would terminate George W.'s rights only. In support, DHHS relies upon the fact that, under the guardianship statute, a child is not required to consent to being placed under guardianship. For the reasons we have explained, Justus's liberty interest in his relationship with his father is implicated in this proceeding. Moreover, DHHS's argument is not persuasive in any event because the issue here is not whether Justus has a veto right over any guardianship—which he does not—but whether he has the right to minimal procedural safeguards in a proceeding that may have the ultimate effect of terminating his bond to his father.

DHHS also cites and relies upon *In re Adoption No. 93321055, supra,* 344 Md. 458, 687 A.2d 681, to support its position that Justus does not have a liberty interest at stake in the guardianship proceeding. That case also has no bearing upon our inquiry. There, the Court of Appeals approved and upheld the "deemed consent" provision of F.L. § 5–322(d) which, as the Court explained, is not triggered until the parent has been given notice of the measures that he or she is required to take to protect his or her parental rights. 344 Md. at 494, 687 A.2d 681. The Court focused its inquiry on whether the statutory scheme comported with due process with respect to the protection of parental rights. It held that,

in the ordinary case, "the parent is given fair and adequate notice of what is required [for the parent to object to the termination of his or her parental rights] and a fair and adequate opportunity to file a timely notice of objection." *Id.* As we have explained, the filing of a notice of objection by a natural parent entitles the parent to a hearing before the court may terminate parental rights. The Court in *In re Adoption No. 93321055* did not address the constitutional adequacy of the statutory scheme with respect to the termination by the State of the child's liberty interest in the parent-child relationship.[7]

### (b)

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "For all its consequence, 'due process' has never been, and perhaps can never be, precisely defined. '[U]nlike some legal rules ... due process is not a technical conception with a fixed content unrelated to time, place and circumstances.' ...

---

7. Justus also contends that the guardianship proceeding was constitutionally inadequate because it deprived him of property interests without due process of law. Specifically, he argues that the petition for guardianship cut off his right to inherit from his father, as well as his right to support from his father. See Md.Code. (1991 Repl.Vol.), § 3-103 of the Estates & Trusts Article; and F.L. § 5-203(b)(1).

DHHS concedes that the termination of George W.'s parental rights had the effect of eliminating Justus's inchoate right to inherit a portion of his father's estate. It responds, however, that Justus waived that argument by not proffering to the court whether any such estate exists. DHHS responds to Justus's second contention, that the granting of the petition permanently deprived him of his right to demand support from his father without due process, by asserting that in effect, he has lost nothing because he can look to DHHS for his support.

Because we have determined that Justus has a liberty interest in his relationship with his father that the State cannot terminated by the State without affording him procedural safeguards that comport with due process of law, we find it unnecessary to reach the question whether the guardianship proceeding implicated Justus's property interests. For the purpose of determining the process to which Justus is due, we must focus on his liberty interest, which is paramount; and the process due to protect that interest will serve to protect any property interest as well.

Rather, the phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty." *Lassiter v. Department of Social Services, supra,* 452 U.S. at 24, 101 S.Ct. 2153 (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)).

It is well-settled that "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Board of Regents v. Roth,* 408 U.S. 564, 570 n. 7, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)). The opportunity to be heard must be " 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). The hearing required, however, only need be one that is "appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). *See also Morrissey v. Brewer, supra,* at 481, 92 S.Ct. 2593 ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."); *Cafeteria Workers v. McElroy, supra,* at 895, 81 S.Ct. 1743 ("The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.").

What "meaningful" process is due when the State seeks to terminate an individual's protected liberty interest depends upon three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural re-

quirement would entail." *Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. 893.

In *In re Adoption No. 93321055, supra,* the Court of Appeals observed with respect to a parent's fundamental right to raise his or her children that "there are few, if any, rights more basic than that one." 344 Md. at 491–92, 687 A.2d 681; *see also, Santosky, supra,* 455 U.S. at 758–59, 102 S.Ct. 1388 (stating that "a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.") (internal quotations and citations omitted). Likewise, Justus's liberty interest in his relationship with his father is basic, significant, and vital; and it is no less so than his father's interest in the relationship. Indeed, consistent with the Supreme Court's assumption in *Michael D.*, a child's liberty interest in maintaining his filial relationship with his parent is "symmetrical with that of h[is] parent." 491 U.S. at 130, 109 S.Ct. 2333. Furthermore, the guardianship, if granted, would work the ultimate infringement on Justus's liberty interest in his relationship with his father, by ending it. *Santosky, supra,* 455 U.S. at 759, 102 S.Ct. 1388.

The countervailing governmental interest flows from the State's duty, as *parens patriae,* to step into the shoes of the parent when he or she is unable or unwilling to fulfill his obligations to the child. To be sure, the State has a paramount concern with the swift and suitable placement of children whose parents are no longer providing for their most basic needs. "Once it appears that reunification with their parents is not possible or in their best interest, the government has not only a special interest but an urgent duty, to obtain a nurturing and permanent placement for them, so they do not continue to drift alone and unattached." *In re Adoption No. 93321055, supra,* 344 Md. at 492, 687 A.2d 681. Yet, the governmental interest in securing a permanent placement for a child is less compelling when the child has reached the age at which he exercises some control over the placement that may be made. No amount of expediency on the part of

DHHS will bring about Justus's adoption—the most permanent of placements—unless Justus consents to it.

We shift our focus then to the risk of error in the process, the likely value, if any, of additional or substitute safeguards, and the burdens that those safeguards might entail. The termination of a child's parental rights necessarily terminates any liberty interest that the child has in his relationship with his parents. As we explained in Part I, when the State seeks to terminate parental rights through a guardianship (as opposed to by adoption), the court is required to conduct a hearing and to make findings, including a "best interest" determination, only if one of the natural parents objects; otherwise, the court has discretion to hold a hearing. F.L. § 5–317(c). The child's statutory entitlement to a hearing is thus tied to his parents' decision(s) to challenge the State's petition. Even when the child's protected liberty interest in his relationship with one or both of his natural parents is at stake in the proceeding, he has no independent channel by which to be heard. It is likely that information from the child that could have a bearing on whether the termination of the parents' rights (and hence the child's rights) will be in his best interest will not be presented to the juvenile court, absent a refusal to consent by at least one parent. In our view, such a procedure—which, in effect, permits an irrebuttable presumption that the termination of parental rights and the filial relationship is in the child's best interest in all cases in which the natural parents have consented by act or by operation of law—poses a risk of error that is not insignificant. Furthermore, in this case, as in the overwhelming number of guardianship cases in which the child has previously been adjudicated CINA, the burden that would flow from the additional safeguard of requiring an evidentiary hearing when the child's liberty interest is at stake is minimal. The guardianship statute already provides that notice of the filing of the petition must be given to the attorney for the child in the CINA proceeding. Moreover, as is plain from the established practice of the juvenile court in the case *sub judice,* it is not unduly

burdensome to allow for the appointment of counsel for children who are the subjects of guardianship proceedings.[8]

■■■■ For these reasons, we hold that, in the circumstances of this case, due process requires that Justus be given the opportunity to be heard in a meaningful way, that is, by presentation of evidence on the question whether the termination of his parent-child relationship with George W. is in his best interest. At age twelve, Justus is old enough to understand the nature of the guardianship proceeding and its effect on him, to have formed considered views about it, and to express those views. In so holding, we point out that in cases in which the government has acted to deprive children of their liberty or property interests, the Supreme Court has held that because children are "peculiar[ly] vulnerab[le]," the process to which they are due need not mirror that which would be afforded an adult. *Bellotti, supra,* 443 U.S. at 634, 99 S.Ct. 3035. As the Supreme Court concluded in *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), hearings for children need not "conform with all of the requirements of a criminal trial or even of the usual administrative hearing ... [,nevertheless they] must measure up to the essentials of due process and fair treatment." *Id.* at 30, 87 S.Ct. 1428.

## CONCLUSION

The juvenile court erred in concluding that only George W.'s parental rights were at stake in the guardianship proceeding. Justus's liberty interest in his relationship with his father was also at stake and, for that reason, he constitutionally was entitled to an opportunity to be heard on the question whether the guardianship would be in his best interest, even though he was not entitled to consent to it. The court erred in denying Justus the process to which he was due.

---

8. We express no opinion as to whether appointment of counsel is necessary or required, but simply observe that it is routinely performed in guardianship cases in Montgomery County.

58

ORDER VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.