934 A.2d 1009

**Mary L. REESE, Guardian**

v.

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE.**

No. 514 Sept. Term, 2006.

Court of Special Appeals of Maryland.

Nov. 2, 2007.

---

104

Daniel L. Robinowitz (Nirali D. Patel, Sidley Austin, LLP, on the brief), Washington, DC, for Appellant.

Kathleen A. Ellis (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, JAMES R. EYLER and
THEODORE G. BLOOM,* (Retired, specially assigned), JJ.

HOLLANDER, Judge.

The State of Maryland has "long supported the reduction of inpatient psychiatric hospital beds in favor of community-based programs." *Williams v. Wasserman,* 164 F.Supp.2d 591, 634 (D.Md.2001) (Blake, J.). Indeed, since the 1970's, the State's "deinstitutionalization" of patients diagnosed with mental illness and developmental disabilities "has been dramatic." *Id.* In large measure, that change was prompted by advocates for the disabled, based on their view that disabled individuals are entitled to, and would prefer, community treatment in lieu of institutional care. But, as this case demonstrates, not every developmentally disabled person who needs professional care prefers placement in the community. In this appeal, the guardian of a mentally retarded adult complains because the State has declined to institutionalize her ward in a State-run facility for the mentally retarded.

In 2004, Mary L. Reese, appellant, and the late William Massa,[1] as guardians of Virginia Massa, sought to admit Ms. Massa, the mentally retarded daughter of Mr. Massa, to a State-operated intermediate care facility, known as a State residential center ("SRC"). As we shall see, in this case the application process implicated federal and State law.

By letter dated July 19, 2005, S. Anthony McCann, then the Secretary of the Maryland Department of Health and Mental Hygiene (the "Department"), appellee, denied the application, based on his determination that placement in the community was an appropriate, less restrictive alternative. The Department subsequently opposed appellant's request for a hearing

---

* Bloom, J. participated in the hearing of the case and in the conference in regard to its decision, but died prior to the adoption of the opinion.

1. Mr. Massa died on October 4, 2005. At the time of his death, he and his partner, the appellant, were Ms. Massa's co-guardians. On November 7, 2005, the Circuit Court for Montgomery County appointed appellant as Ms. Massa's sole guardian.

at the Office of Administrative Hearings ("OAH"), at which appellant sought to present evidence as to Ms. Massa's condition. The Department claimed that the denial of a request for admission to a SRC is not a contested case under the Administrative Procedure Act ("APA"), Md.Code (2004, 2006 Supp.), §§ 10–201 through 10–226 of the State Gov't. Article ("S.G."), and therefore there was no entitlement to such a hearing. OAH agreed with the Department and denied the request.

Thereafter, Ms. Reese appealed the OAH decision to the Department's Board of Review (the "Board"), which upheld OAH by order dated December 12, 2005. She then filed a petition for judicial review in the Circuit Court for Montgomery County. On March 15, 2006, the court granted the Department's motion to dismiss. This appeal followed.

Appellant presents three issues, which we quote:

1. Whether the State's policy of preventing individuals with qualifying developmental disabilities from obtaining admission to State Residential Centers ("SRCs") violates the freedom of choice requirement of the federal Medicaid statute and its implementing regulations.

2. Whether the State has failed to furnish Medicaid services it agreed to provide Ms. Massa with "reasonable promptness" in violation of federal Medicaid law.

3. Whether the State's interpretation of Md.Code Ann. Health–Gen. Art. § § 7–503 and 7–504, which forecloses any review of the Secretary's denial of SRC admission, violates Appellant's due process rights.

For the reasons that follow, we shall vacate and remand.

## I. STATUTORY & REGULATORY FRAMEWORK

To understand the facts and the issues, it is helpful to begin with a brief review of the federal and State statutory schemes.

The Medicaid program, established by Title XIX of the Social Security Act, Title 42 U.S.C. § 1396, *et seq.*, is a "jointly funded collaboration" in which the federal and state governments furnish medical services to low income persons who are

unable to meet the costs of their own medical care, as well as long-term care for eligible persons. *Dept. of Health & Mental Hygiene v. Campbell,* 364 Md. 108, 112, 771 A.2d 1051 (2001); *see* 42 U.S.C. §§ 1396–1396v; Md.Code (1982, 2000 Repl.Vol., 2005 Repl.Vol., 2006 Supp.), § 15–103(a)(2) of the Health–General Article ("H.G."). Medicaid beneficiaries include low income adults and children, the elderly, and the disabled. 42 U.S.C. § 1396a(a)(10)(A); COMAR 10.09.24.03D(4) (including a disabled person in the list of "Medically Needy").

State participation in Medicaid is voluntary. *Campbell,* 364 Md. at 112, 771 A.2d 1051. But, once a state opts to participate, it must operate its program in compliance with federal statutory and regulatory requirements. 42 U.S.C. 1396a(a)(1). A participating state must develop a state Medicaid Plan for the provision of services that the state intends to provide under the program, which is reviewed by the Health Care Financing Administration ("HCFA"). 42 U.S.C. § 1396a. Once HCFA approves the plan, the state is eligible for federal funding. *Campbell,* 364 Md. at 112, 771 A.2d 1051. When the state implements a plan for medical assistance, the plan becomes mandatory. 42 U.S.C. § 1396a(a)(1).

Maryland has opted to participate in the Medicaid program through the Maryland Medical Assistance Program. *Campbell,* 364 Md. at 112, 771 A.2d 1051. The program is administered by the Department and overseen at the federal level by the Department of Health and Human Services ("HHS").[2]

According to appellant, Maryland's State Medicaid Plan indicates that Maryland provides services to eligible retarded persons in an Intermediate Care Facility for the Mentally Retarded ("ICF–MR"). 42 U.S.C. § 1396d(d).[3] ICF–MRs

---

**2.** The Medicaid statute defines "medical assistance" as the "payment of part or all of the cost" of particular services. 42 U.S.C. § 1396d(a). It requires that states furnish "medical assistance" with reasonable promptness. *Id.* at § 1396a(a)(8). *See Mandy R. v. Owens,* 464 F.3d 1139, 1146 (10th Cir.2006); *Westside Mothers v. Olszewski,* 454 F.3d 532, 540 n. 1 (6th Cir.2006); *Bruggeman v. Blagojevich,* 324 F.3d 906, 910 (7th Cir.2003).

**3.** Appellant cites Md. State Plan § 3.1(a)(2)(viii)(2000).

provide residential health and rehabilitative services to men-
tally retarded individuals under "such standards as may be
prescribed by the Secretary [of HSS]." 42 U.S.C. § 1396d(d).[4]

Maryland has four ICF–MR facilities, all of which are
designated SRCs. *See* MARYLAND HEALTH CARE COMMISSION, AN
ANALYSIS AND EVALUATION OF THE CON PROGRAM (2002).[5] They
are operated by the Maryland Developmental Disabilities Ad-
ministration ("DDA"), an agency within the Department.
H.G. §§ 7–201, 7–501.

In 1981, Congress created the Home and Community Based
Services Waiver program ("HCBS"), which allows states to
offer long-term care, not otherwise available through their
Medicaid programs, to serve eligible individuals in their own
homes and communities, instead of hospitals, nursing facilities,
or ICF–MRs. 42 U.S.C. § 1396n(c)(1). *See* S.Rep. No. 97–
139 & H.R.Rep. No. 97–208, 97th Cong., 1st Sess. 1981,

---

4. 42 U.S.C. § 1396d(d) defines an ICF–MR as:
 [A]n institution (or distinct part thereof) for the mentally retarded or
 persons with related conditions if—
 (1) the primary purpose of such institution (or distinct part thereof) is
 to provide health or rehabilitative services for mentally retarded
 individuals and the institution meets such standards as may be
 prescribed by the Secretary[.]
 42 Code of Federal Regulations ("C.F.R.") 435.1010 defines an "insti-
 tution for the mentally retarded or persons with related conditions" as
 an institution that:
 (a) Is primarily for the diagnosis, treatment, or rehabilitation of the
 mentally retarded or persons with related conditions; and
 (b) Provides, in a protected residential setting, ongoing evaluation,
 planning, 24–hour supervision, coordination, and integration of
 health or rehabilitative services to help each individual function at his
 greatest ability.

5. In 1981, there were ten SRCs in Maryland. *Id.* According to
 appellant, the decrease in SRCs in Maryland is consistent with
 a national trend away from institutionalizing the mentally retarded
 and toward integrating such individuals in community placements.[ ]
 However, the move toward community placement has resulted in
 substantial quality management and system infrastructure challenges
 for state and local governments.[ ] Moreover, there is significantly
 less government oversight of community agencies and group homes
 providing residential long-term care services for the mentally retard-
 ed than for ICF–MRs.

*reprinted in* 1981 U.S.Code Cong. & Admin.News p. 396 & 1981 U.S.Code Cong. & Admin.News p. 1010. The federal regulation states: "Section 1915(c) of the Act permits States to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization." 42 C.F.R. § 441.300. Under 42 U.S.C. § 1396n(c)(1), the Medicaid statute allows states to apply for a waiver from HHS to pay for community-based services "pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or nursing facility or [ICF–MR] the cost of which could be reimbursed under the State plan." [6]

Pursuant to 42 C.F.R. § 441.302(d), a waiver will not be granted unless a state furnishes adequate assurances that, when a recipient is determined to be likely to require the level of care provided in a hospital, NF, or ICF/MR, the recipient or his/ her legal representative will be—

(1) Informed of any feasible alternatives available under the waiver; and

(2) Given the choice of either institutional or home and community-based services.

*See* 42 U.S.C. § 1396n(c)(2) ("A waiver shall not be granted under this subsection unless the State provides assurances satisfactory to the Secretary that ... such individuals who are determined to be likely to require the level of care provided in a hospital, nursing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility

---

**6.** According to appellant, the HCBS Waiver program provides states with "flexibility" in creating "alternatives to institutional care for eligible populations, including the mentally disabled." Under the waiver provisions, states may include as "medical assistance" the cost of home or community-based services which, if not provided, would require care to be provided in another setting, such as a nursing home or ICF–MR. 42 U.S.C. § 1396n(c); 42 C.F.R. § 435.217.

services, or services in an intermediate care facility for the mentally retarded[.]").

· Like many other states, Maryland strongly favors home and community based care for the developmentally disabled over state-run institutional care.[7] As the State has recognized, its efforts in regard to deinstitutionalization have led to the closure or downsizing of many state residential facilities. Indeed, Maryland "has been in the forefront" in developing community and home based care for the mentally disabled. *Williams,* 164 F.Supp.2d at 634.[8]

H.G. § 7–102 reflects the State's policy favoring community placement. It provides, in part:

### § 7–102. Legislative policy.

To advance the public interest, it is the policy of this State:

\* \* \*

(4) To foster the integration of individuals with developmental disability into the ordinary life of the communities where these individuals live;

(5) To support and provide resources to operate community services to sustain individuals with developmental disability in the community, rather than in institutions;

---

**7.** Governor Harry Hughes created the Commission to Rewrite the Mental Retardation and Developmental Disabilities Law, which delivered its report to the Governor on December 13, 1985. *See* S.B. 394 and H.B. 711, Acts of 1986, Ch. 636, § 2. Subtitle 5 of the Health–General Article governs conditions of admission to and release from SRCs, and is similar to the law that was already in effect. An attachment to the written testimony of Andrew Wigglesworth, Executive Assistant, titled "Comparison of Current Health–General Title VII and S.B. 394/HB. 711," noted that the existing law "indicates the belief that placement in a State Residential Center should be a last resort, used only if the individual is clearly eligible. . . ." *See also* footnote 5, *supra.*

**8.** In *Williams* the plaintiffs took a position that is at odds with appellant's; they complained there about the State's failure to provide community treatment rather than institutional care. *Id.* at 595. ·

(6) To require the Administration to designate sufficient resources to foster and strengthen a permanent comprehensive system of community programming for individuals with developmental disability as an alternative to institutional care . . .

The statutory scheme implements the policy favoring non-institutional placements by setting strict institutional admissions requirements and by imposing on the Department the burden to demonstrate to a hearing officer, by clear and convincing evidence, that such an admission is appropriate. H.G. § 7–502 provides:

### § 7–502. Admissions.

(a) *Approval by Secretary.*—The Secretary shall approve the admission of an individual to a State residential center only if:

(1) The findings of the evaluation are that the individual:

(i) Has mental retardation; and

(ii) For adequate habilitation, needs residential services; and

(2) There is no less restrictive setting in which the needed services can be provided and that is available to the individual or will be available to the individual within a reasonable time.

(b) *When the Secretary may not approve.*—The Secretary may not approve the admission of an individual to a State residential center if:

(1) The findings of the evaluation are that the individual:

(i) Does not have mental retardation; or

(ii) Has mental retardation but does not need residential services for adequate habilitation; or

(2) There is a less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time.

(c) *Providing least restrictive service.*—The Secretary shall provide an individual with the appropriate least restrictive service consistent with the individual's welfare, safety, and plan of habilitation, if the individual:

(1) Has an application for services that has been approved under § 7–404(c) of this title; or

(2) Is considered eligible for transfer under Subtitle 8 of this title by the Director or the Director's designee.

Notably, H.G. § 7–503 provides for a hearing only if the Secretary *approves* the admission to a SRC, but not if he or she denies an application for admission. It states:

### § 7–503. Hearings; notice.

(a) *Hearing on admission.*—Within 21 days after the admission of an individual to a State residential center, a hearing officer of the Department shall hold a hearing on the admission in accordance with the rules and regulations that the Secretary adopts.

\* \* \*

(e) *Findings supporting admission.*—(1) At the hearing, in order to certify the admission of the individual, it must be affirmatively shown by clear and convincing evidence that the conclusions leading to the decision to admit the individual are supported by the following findings:

(i) The individual has mental retardation;

(ii) The individual needs residential services for the individual's adequate habilitation; and

(iii) There is no less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time after the hearing.

(2) If the hearing officer shall find from the admissible evidence that the conclusions leading to the admission are not proved, the hearing officer shall so certify and the individual shall be released from the State residential center.

(3) If the hearing officer shall find from clear and convincing evidence that all of the admission requirements have been proved, the hearing officer shall so certify and the individual's admission shall be considered approved.

(4) If the hearing officer certifies the admission of an individual to a State residential center, the hearing officer shall, at the conclusion of the hearing, write on the certification form any additional services of habilitation that are not included in the evaluation report, but that the hearing officer finds from the evidence are needed by the individual.

(5) If the hearing officer certifies the admission of an individual to a State residential center, the hearing officer shall, at the conclusion of the hearing, advise that individual and the legal counsel of the individual's right to seek judicial release from the State residential center under § 7–507 of this subtitle. The hearing officer shall also advise that individual and the legal counsel of:

(i) The individual's rights under the appeal provisions of §§ 10–222 and 10–223 of the State Government Article; and

(ii) The individual's right to file a petition for habeas corpus under § 7–506 of this subtitle.[9]

H.G. § 2–206 sets forth the "powers and duties" of the Board of Review of the Department. H.G. § 2–206(c) provides, in part:

§ 2–206. **Powers and duties.**

\* \* \*

(c) *Appeals to be heard and determined by Board.*— Except as expressly provided otherwise, the Board shall hear and determine any appeal from:

(1) A decision of the Secretary or any unit in the Department in a contested case that is subject to judicial review under § 10–215 of the State Government Article;

(2) A decision of the Secretary or any unit in the Department that is subject to judicial review under any provision of law other than §§ 10–125, 10–128 and 10–215 of the State Government Article; and

(3) An action of or inaction by any unit in the Department for which the Secretary, by rule or regulation, provides for review by the Board.

Moreover, H.G. § 2–207(a) states:

---

9. Sections H.G. 7–503(b), (c), and (d) concern notice of admission, the content of the notice, and the forms for notice of admission. H.G. § 7–505 provides for the yearly reevaluation of each individual admitted to a SRC to determine whether the *individual should remain in a SRC.* H.G. § § 7–507 and 7–508 set forth the procedure by which an individual housed in a SRC can petition for release and the conditions of such a release.

### § 2–207. Appeals to Board; judicial review.

(a) *Right of appeal.*—If any person is aggrieved by any decision, action, or inaction on the part of the Secretary or of any unit in the Department for which an appeal to the Board is provided by this subtitle, that person is entitled to appeal as provided in this section.

H.G. § 7–504 is of particular import here, as it pertains to judicial review in matters regarding SRC's. It states:

### § 7–504. Determination of hearing officer.

(a) *Review by Board of Review of Department prohibited.*—The Board of Review of the Department does not have jurisdiction to review the determination of a hearing officer on an admission under this subtitle.

(b) *Final decision of Department for purposes of judicial review.*—The determination of the hearing officer is a final decision of the Department for purpose of judicial review of final decisions under Title 10, Subtitle 2 of the State Government Article.

Finally, we point to Subtitle 4 of the Health–General Article, titled: "Provision of Services." Section 7–406, which appellant invoked when she asked the Secretary to review his decision, states: [10]

(a) *Request for informal hearings.*—An applicant for services or a recipient of services under this title may:

(1) Request an informal hearing before the Secretary's designee on any action or inaction of the Secretary made under this title; and

(2) Request the Secretary to review the decision of the informal hearing.

(b) *Procedure.*—After the Secretary receives a request for a review, the Secretary shall conduct the review in accordance with Title 10, Subtitle 2 of the State Government Article.

---

**10.** The parties do not suggest that H.G. § 7–406 applies here, presumably because the case does not involve an application for services within the meaning of Subtitle 4.

Notwithstanding the State's policy in favor of home and community based care, the Department acknowledges that, "[u]nder federal law, a Medicaid recipient does have the right to choose among available providers. *See* 42 U.S.C. § 1396a(a)(23)." But, appellee insists that it is not required to place Ms. Reese in a SRC in order to comply with federal law. It explains: "Maryland has chosen to implement that 'freedom of choice' requirement for the Waiver Program by paying for placements at institutions other than SRCs, and the federal government has approved Maryland's plan." Appellee asserts: "There is nothing in the record to suggest that Ms. Reese has tried to locate another institution or that the Department has refused to pay for care at another institution." It adds: "[T]here is no basis for concluding that Maryland has not complied with the requirements of the Medicaid statute."

With the statutory framework in mind, we turn to review the factual and procedural history pertinent to this case.

## II. FACTUAL AND PROCEDURAL SUMMARY

Ms. Massa was born on September 19, 1944. At the age of 16, she was stricken with viral encephalitis that left her profoundly retarded. She is covered by Medicaid.[11] Ms. Massa resided at Great Oaks Center, a SRC, from the early 1970's until 1996, when the State closed that facility. At that time, Ms. Massa's father opposed the Department's decision to transfer his daughter to a community residential placement. The disagreement culminated in a Settlement Agreement in the Spring of 1996 [12] between the Department and Mr. Massa, by which Ms. Massa was to be moved to her current residence, a community home operated by the Arc of Howard

---

11. The parties have not referred us to any specific place in the record to document Ms. Massa's Medicaid status, but it is undisputed that she is a Medicaid recipient.

12. The agreement was signed on various dates by Mr. Massa, an attorney for Ms. Massa, the DDA, the Arc of Howard County, and an Administrative Law Judge.

County. Among other things, the Settlement Agreement addressed Mr. Massa's concerns about community placement with regard to staffing, choice of roommates, medical care, and wheelchair accessibility. Paragraph 13 of the Settlement Agreement provides:

> The parties consent to mediation should there be any dispute arising from an alleged failure of any party to fulfill the terms of the Agreement. The mediation will be conducted by the Office of Administrative Hearings. After mediation, the parties may avail themselves of other applicable remedies.

On October 27, 2004, Ms. Massa's co-guardians sought her admission to the Holly Center, a SRC located on the Eastern Shore. Appellant's affidavit avers that, on January 24, 2005, the Department indicated that Ms. Massa would be permitted to move to the Holly Center on February 15, 2005. Two weeks later, however, the Department advised that Ms. Massa's admittance had been postponed, pending approval by the Secretary.

In May of 2005, pursuant to the Settlement Agreement, the parties participated in mediation, which proved unsuccessful. Consequently, a hearing on the merits was scheduled at OAH for late July 2005. But, on July 12, 2005, the Department asked OAH to cancel the hearing, claiming it was "premature" because the Secretary had not yet rendered his decision concerning Ms. Massa's admission to the Holly Center. If Ms. Massa's application were denied, explained the Department, a hearing would be unnecessary because "there is no provision in the [SRC] statute for a hearing before OAH."

Appellant's attorney responded the next day, claiming that the Department "has consistently delayed and resisted making a final decision with respect to Ms. Massa's admission to Holly Center." Her counsel added: "Ms. Massa is entitled to this hearing that was scheduled and agreed upon by counsel following the mediation. Ms. Massa has been awaiting an admission decision from the Department that is clearly not forthcoming."

In a letter of July 19, 2005, to appellant and Mr. Massa, Secretary McCann denied the application for Ms. Massa's admission to Holly Center. The letter stated:

I reviewed Ms. Massa's file carefully in considering whether to grant your request that she be admitted to Holly Center. I applaud your continued, in-depth involvement in your daughter's/ward's life and your work with the Developmental Disabilities Administration ("DDA") and the providers. Although DDA and Mr. Massa initially disagreed about where Ms. Massa should be served when Great Oaks closed in 1996, agreement was reached that Ms. Massa be served in the community.

You now ask that Ms. Massa be transferred from her community residential and day service providers of 9 years and admitted to Holly Center, a state residential center ("SRC"). As explained below, Maryland law requires that I deny your request for admission.

Both the State of Maryland and the federal government have strong policies favoring community-based services over institutional ones ... Effective this year, House Bill 794, requires that all barriers that prevent an individual in a SRC from living in the community be identified. Additionally, it is now Maryland law that each individual has a right to receive services in the most integrated setting available. The admission criteria to a DDA operated and funded SRC incorporate these policies.

Admission to a SRC is predicated on there not being an appropriate residential placement in the community. An individual can be admitted only if there is no less restrictive setting in which the needed services can be provided and that is available to the individual. Additionally, unlike admission to other types of facilities or programs to which an individual may admit him/herself, only the Secretary can authorize admission to an SRC.

The legislature has mandated other safeguards to assure that an individual is not inappropriately admitted to a SRC. The statute requires an independent review by the Office of Administrative Hearings ("OAH") within twenty-one days

after admission as well as an annual re-evaluation. Thus, the statutory scheme is to permit admission into a SRC only if there are no community options.

*For Ms. Massa to be admitted to Holly Center, I would have to find that services in the community are not currently meeting her needs and that there is no community provider who could do so. I do not so find.* Rather my review of her file discloses that:

1) Ms. Massa has been living in the community for over nine years;

2) DDA is meeting the conditions in the Settlement Agreement;

3) In the community, Ms. Massa has improved her ability to walk and to perform activities of daily living;

4) During this time, the staff providing services to Ms. Massa have been remarkably stable. Two of the staff at the day treatment program have been with Ms. Massa since 1996; at her home, one staff person has been there since 1996, two since 1997, and one since 1998;

5) Both the residential and the day programs provide Ms. Massa with a broad range of community activities;

6) Although there was some delay in medical follow-up treatment because of the retirement of Ms. Massa's physician, a new physician has been found and medical appointments are timely;

7) If Ms. Massa's physician recommends occupational therapy, physical therapy or any medical service, DDA will fund those services, if not covered by Medicaid;

8) Ms. Massa's dietary needs are being monitored by her physician who is satisfied with her current weight; and

9) There is open communication between DDA's Southern Regional Office and you to discuss an issues related to Ms. Massa's care.

This indicates to me that Ms. Massa is receiving residential services that meet her habilitation needs in a less restrictive setting than Holly Center.

*To be noted is, that under DDA's Home and Community Based Waiver, Ms. Massa could choose to receive residential services in an institution rather than the community. However, what you have requested is her admission to a state-run institution, Holly Center. I want to be clear that I am not denying Ms. Massa's right to choose to be served in an ICF–MR. I am denying her admission to a state residential center, the admission standards for which are set forth in law.*

If you wish to explore transferring Ms. Massa to another community provider or to an intermediate care facility, other than a SRC, DDA's regional office will work with you . . .

(Emphasis added.)

Two advisory letters were appended to Secretary McCann's letter. One was a letter of March 22, 2004, to Thomas Middleton, Chair of the Maryland Senate Finance Committee, signed by Robert McDonald, Esquire, Chief Counsel, Opinions and Advice, Maryland Office of the Attorney General, and the former Maryland Attorney General, Joseph Curran. They wrote:

You have asked for our opinion whether State law concerning care of a developmentally disabled individual is consistent with federal law and the Supreme Court decision in *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). We have reviewed the recent letter of advice on this issue by Assistant Attorney General Kathryn M. Rowe, a copy of which is attached. Letter to Honorable J. Lowell Stolzfus dated January 27, 2004. Ms. Rowe's letter accurately describes the *Olmstead* case, the requirements of the federal Medicaid law, and the current State law that favors home and community based care over institutional care for mentally retarded individuals.

In our view, Maryland law is consistent with the *Olmstead* decision, which primarily concerned the right of mentally disabled individuals to community placement under the Americans with Disabilities Act ("ADA") in certain circum-

stances. As Ms. Roe's letter notes, the restrictions in State law on admission to State residential facilities for mentally retarded persons may appear to be at odds with the requirement of the Medicaid law that a Medicaid beneficiary who needs the level of care provided in a hospital, nursing facility, or intermediate care facility have an option to choose institutional services even if that individual also qualifies for home or community based services.[1] *See* 42 CFR § 441.302(d)(2). *However, we understand that the Department of Health and Mental Hygiene has adopted a policy of satisfying the "choice" requirement by offering out-of-State institutional placements to Medicaid beneficiaries at State expense.* We also understand that the federal Department of Health and Human Services, the agency that promulgated the regulation cited above and that implements the Medicaid waiver program, has accepted Maryland's policy as compliance with the choice requirement.[2]

---

FN1. The *Olmstead* decision noted that neither the ADA nor the regulations adopted pursuant to the ADA require that community-based treatment be imposed on patients who do not desire it. 527 U.S. at 602, 119 S.Ct. 2176.

FN2. Of course, we cannot address in a legal opinion factual issues concerning how that policy is carried out.

---

(Emphasis added.)

The other letter was written by Kathryn Rowe, Assistant Attorney General, to the Honorable J. Lowell Stoltzfus, dated January 27, 2004. She wrote:

You have asked for advice as to whether there is a conflict between Maryland law and federal law with respect to the rights of an individual with developmental disability to chose between care in a state residential facility and a community based care facility. It is my view that there is a theoretical conflict between State law and the federal law with respect to Medicaid recipients' rights of choice. There is no conflict with respect to persons whose services are not funded by Medicaid. Moreover, with respect to Medicaid recipients, it

is my view that it may be possible to resolve this conflict in ways that are consistent with State law.

FEDERAL LAW

Medicaid

The regulations implementing the waiver authority specify that the state must assure that when a recipient is determined to be likely to require the level of care provided in a hospital, nursing facility, or immediate care facility for the mentally retarded, that individual or his or her legal representatives will be informed of any feasible alternatives available under the waiver, and given the choice of either institutional or home and community based services. 42 C.F.R. § 441.302(d). *Cramer v. Chiles*, 33 F.Supp.2d 1342 (S.D.F[la].1999).

Thus, there can be no question that federal law requires that a Medicaid recipient in need of residential services be given the choice between institutional and home or community based services. However, it is worthy of note that federal policy generally favors home and community based services over institutional ones. *See* Executive Order of June 18, 2001, stating that the "United States is committed to community-based alternatives for individuals with disabilities and recognizes that such services advance the best interests of Americans," and letters of January 14, 2000 to state medicaid directors and governors, stating that the *Olmstead* decision "confirms what this Administration already believes: that no one should have to live in an institution or a nursing home if they can live in the community with the right support."[1] *See also* 42 U.S.C. § 1396a(a)(31) and (44)(A).

*Olmstead v. L.C.*

In *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court held that the Americans with Disabilities Act (ADA) requires placement of persons with mental disabilities in community settings rather than in institutions where "the State's treatment professionals have determined that community placement is ap-

propriate, *the transfer from institutional care to a less restrictive setting is not opposed by the individual,* and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Because *this decision expressly recognizes that the ADA does not require less restrictive care where the individual opposes it,* there is no conflict between this case and the federal law and regulations relating to Medicaid services for the developmentally disabled.

STATE LAW

Maryland law very strongly favors home and community based care over institutional care. Health General Article § 7–102 provides that, "[t]o advance the public interest, it is the policy of this State:

(4) To foster the integration of individuals with developmental disability into the ordinary life of the communities where these individuals live;

(5) To support and provide resources to operate community services to sustain individuals with developmental disability in the community, rather than in institutions.

(6) To require the Administration to designate sufficient resources to foster and strengthen a permanent comprehensive system of community programming for individuals with developmental disability as an alternative to institutional care."[ ]

With respect to State facilities for the mentally retarded the law reflects this policy by denying admission to any person unless it is shown that the person has mentally [sic] retardation, that residential services are needed for adequate habitation, and that there is no less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time. HG § 7–502(a) and (b). These findings must be confirmed at a hearing held after admission, HG § 7–503(e), and the individual must be re-evaluated annually to determine whether institutional placement is still neces-

sary, HG § 7–505. Thus, under Maryland law, a person is not qualified for admission to a State facility for the retarded if home or community based care is available and would be appropriate.[1]

DISCUSSION

The restriction on admissions to State residential facilities for the mentally retarded does make it more difficult to comply with the requirement of federal law that Medicaid beneficiaries who qualify for home or community based services be given the option of institutional services instead. However, the choice provisions of federal law do not give a Medicaid recipient a right to receive services from an unwilling provider. *See* 42 U.S.C. § 1396a(a)(23). Nor do these restrictions make compliance with the federal law impossible. Where a Medicaid recipient chooses institutional over home or community services, the State could pay for services for the person in an institution in another state. Federal law requires this opinion only for Medicaid recipients, and not for persons who receive State or privately funded services.

(Emphasis added.)

On July 22, 2005, the Department filed a "Motion to Dismiss" the OAH hearing. It claimed that "the applicable statute does not give Ms. Massa a right to an adjudicatory hearing" with regard to the Secretary's decision to deny her admission to Holly Center. In her opposition, appellant argued that her due process rights would be violated if she were not granted an opportunity to be heard. In a one line order, an Administrative Law Judge ("ALJ") granted the Department's motion on July 25, 2006. As a result, no hearing was held.

Ms. Reese wrote to Secretary McCann on August 24, 2005, requesting an informal hearing pursuant to H.G. § 7–406 with regard to his denial of Ms. Massa's admission to Holly Center. On the same day, Ms. Reese wrote to the Board, stating that she was "appealing the Office of Administrative Hearing's dismissal of the ... case ...," and she asked that the matter

be set "for hearing before the Department's Board of Review." On August 26, 2005, the Board acknowledged receipt of Reese's request for a hearing, and informed appellant of its procedures set forth in COMAR 10.01.05. She was advised that she would be notified of the time and date of the hearing.[13] On September 14, the Board liaison wrote to appellant, stating: "A copy of the record concerning the above captioned case is enclosed."[14] She was also informed of her right to submit a brief, and told that a hearing had been set for October 27, 2005. It was later postponed.

In the meantime, on September 14, 2005, the Department filed a "Motion to Dismiss." It contended that, under H.G. § 7–504(a) and H.G. § 2–206(c), the Board did not have jurisdiction to review the Secretary's decision. The matter was eventually reset for December 8, 2005.

On December 5, 2005, appellant filed a "Brief of Appellant Mary L. Reese," a "Motion to Supplement the Record," and a "Motion for Leave of the Board to File Appellant's Brief." The motion to supplement the record included a number of exhibits, such as an affidavit of appellant; the Settlement Agreement; some of Ms. Massa's medical records; and opinion letters from the Office of the Attorney General regarding the legality of Maryland's SRC provisions. The motion for leave stated:

> Although Code of Maryland Regulations (COMAR) § 10.01.06.07.B requires that appellants provide notice of the intention to file a brief within 30 days after the liaison acknowledges receipt of the notice of appeal, Ms. Reese had filed her notice of appeal *pro se* and had not yet engaged

---

13. On August 30, 2005, OAH wrote to the Board liaison, stating: "Because the appellant failed to appear at the hearing, no transcript is available." It is not clear to us what hearing appellant failed to attend. We found no indication in the administrative record of such a failure.

14. Under COMAR 10.01.05.07C(1), appellant could have filed a brief with the Board "within 40 days after the Board liaison sent a copy of the record and the transcript to the parties." But, we are unable to discern whether a record was actually forwarded to appellant.

this law firm to represent her during the time period in question. In addition, while COMAR § 10.01.06.07.C requires that appellants file a brief within 40 days after receiving a copy of the record and transcript from the liaison, Ms. Reese never received such a transcript because there was no initial hearing in this proceeding. In fact, six days before the initial hearing scheduled by Office of Administrative Hearings ("OAH") was to take place, Secretary McCann issued a letter denying Ms. Massa's admission to Holly Center. OAH subsequently dismissed the July 26th hearing from the docket in light of the Secretary's decision.

Thus, Ms. Reese has never been allowed to exercise her due process right to a fair hearing under the U.S. and Maryland Constitutions. The only evidence in the record on which the Board has to determine whether to affirm, deny, or remand the Secretary's letter ruling is the letter itself. Therefore, the Board needs an adequate record and a written explanation of the complexities at issue prior to making its decision.

The Department opposed appellant's motion to supplement the record.

On December 8, 2005, the Board convened for the hearing. With regard to appellant's motion to supplement the record, the Department urged the Board to deny the request because the materials were not part of the record before OAH. Appellant's counsel responded that, without the supplemental information, the record was inadequate for the Board to make a decision. The following colloquy is relevant:

[CHAIRPERSON]: ... There are two barriers [to admitting the materials]. One, we haven't read it. Two, the Attorney General won't admit it. And, three, it was late. So regardless of where you go from there or why you're here, that doesn't solve the problem for the Board. We're restricted legally to what is in the record. We are not—we are an appeals board.

[APPELLANT'S COUNSEL]: I understand. I understand your concern. And should the Board wish to postpone so

that they could have an ample opportunity to read our submissions, we would be willing—we would be willing to accommodate.

[CHAIRPERSON]: Thank you. And what is your response?

[COUNSEL FOR DEPARTMENT]: My response is that I would oppose any postponement. Because for the simple reason that these materials that were submitted should not be supplemented, should not supplement the record. Because the record, as you said, should only be of what took place below. And *what took place below, is a dismissal of the hearing.*

*And I believe that [appellant's counsel] is mis-characterizing the purpose of today's hearing. It is not so that this Board could review the Secretary of the Department's decision regarding Ms. Massa's denial—the denial of Ms. Massa's admission to the Holly Center. It is only the propriety of the ALJ's dismissal of the case before OAH. And that is it. And that—it has no bearing on the merits of Ms. Massa's issue with the denial.*

[APPELLANT'S COUNSEL]: The ALJ's decision dismissing the hearing that was scheduled for July 26th, and [that] was set by Judge Pratt, of the Office of Administrative Hearings after a mediation in May, I believe, where he heard both sides. The Attorney General's arguments as well as Ms. Reese's arguments as to why Ms. Massa belongs in an SRC. And that that's the most appropriate place for her, decided to set a hearing for July 26th.

And the State moved even before that hearing date was set to dismiss the hearing, because the Secretary had not made a decision as to whether Ms. Massa should be admitted to Holly Center. So they moved to dismiss the hearing even before there was any opportunity for Ms. Reese or Ms. Massa to make their case as to why she should go to an SRC.

The Secretary then made his decision. And after he denied admission to the SRC, then the State moved to

dismiss, because a decision had been made. And, therefore they believe that she should not be given an opportunity to be heard and make her arguments as to refute the denial. So Ms. Reese has not been given an opportunity to present her side of the story, either before [sic] the Secretary made his decision.

She also requested, through written correspondence and several phone calls, meetings with the Secretary to explain her reasons why Ms. Massa is best suited to live in a State Residential Center. The hearing did not take place, because the Secretary made his decision six days before the hearing was set to take place.

And then the Judge promptly dismissed the hearing upon motion of the Department. And issued a one-sentence order saying that he dismissed the case. And did not provide any reasons or rationale for why the case was dismissed.

*We ask that the Board hear the merits of the case, whether it be today or after they've had an appropriate time to go through the exhibits that we have provided. Because due process requires that Ms. Reese at least be given a chance to make her case. And have an opportunity to be heard . . .*

(Emphasis added.)

The Chair emphasized that the purpose of the hearing was to determine whether the Board was "allowed to hear it. That's all we are talking about." It determined that it would not accept the supplemental record, but indicated that it "was willing to hear the case on the record of the information we have read." Appellant's counsel responded (emphasis added):

Our problem with your suggestion, Madam Chairwoman, is that the core of our argument at this point *is there is no record.* Because . . . *[t]here has been no meaningful opportunity for Ms. Reese and Ms. Massa to make their case to anyone* here other than a mediator. And we know that that doesn't count.

What counts is the opportunity to make your case to a decision maker. That is why we saw a need to supplement the record when we got involved in the case. So we would ask the Board members to give some consideration to our supplemental record.

The Board reiterated that it would not permit supplementation of the record. Appellant's counsel also asked the Board to remand the case to an ALJ "in order for a hearing on the merits to be heard...." The Department responded that a "remand would be improper," because the OAH "does not have jurisdiction to hear the case."

The following exchange is also pertinent:

[COUNSEL FOR APPELLANT]: The facts before the Secretary ... were incomplete. And Ms. Reese did not receive an opportunity to meet with the Secretary or anyone else from the Department ... and present the factual evidence that shows that there is no less restrictive setting for her ward to be in.

[COUNSEL FOR APPELLEE]: And the decision that was made by the Secretary, and what went into that decision, is not before the Board at this time. And should not go into your decision as to whether or not to dismiss this case or remand it. The only thing before this Board today is whether or not the ALJ was proper in dismissing the case.

The merits of the case, as you have already noted on the record, have no bearing on the Board's decision today.

[COUNSEL FOR APPELLANT]: If the merits have no bearing, then due process, procedurally, requires that Ms. Reese, at some point during this administrative process, be given an opportunity to be heard. She has been deprived of that right. And that's why we ask the Board to please remand the case to an Administrative Law Judge so that due process can be provided to Ms. Reese.

\* \* \*

[APPELLEE'S COUNSEL]: The law says that if an individual meets the criteria for admission to a State residential center, then they're entitled to a hearing.

And that is because the public policy in the State of Maryland is—favors community placement versus institutional care. To put someone into an institution, into a State residential center, is—infringes on a liberty interest. And so the hearing that is held pursuant to 7–502 of the Health General Article, is to ensure that the individual meets the criteria, so that their liberty interest is not infringed upon.

As far as due process requiring a hearing in this circumstance, where Ms. Massa's admission was denied, due process only requires a hearing when the State seeks to deprive an individual of a liberty or a property interest.

Ms. Massa does not have a liberty or property interest in being admitted to a State residential center. There is federal law that allows Ms. Massa to choose whether she wants to be served in the community or in a State residential center.... The Department is saying that she cannot reside at the Holly Center. If she chooses to reside at an ICFMR, an Intermediate Care Facility for the Mentally Retarded, she can do so in another state.

On December 12, 2005, the Board filed an "Order" affirming the decision of the ALJ, based on "the entire record of this case." It also "adopt[ed] the Findings of Fact and Conclusion of the Law set forth therein." [15]

Thereafter, on January 11, 2006, appellant filed a "Petition for Judicial Review" in the circuit court. She requested review of:

1. The July 19, 2005 decision of S. Anthony McCann, Secretary, Department of Health and Mental Hygiene ("DHMH"), denying Ms. Massa admission to a state residential center.

2. The July 25, 2005 Order of Administrative Law Judge William C. Herzing dismissing the hearing scheduled for July 26, 2005 before the Office of Administrative Hearings

---

**15.** We pause to note that the ALJ made no findings of fact or conclusions of law.

("OAH") in light of the Secretary's decision to deny Ms. Massa admission to an SRC.

3. The December 12, 2005 Order of the Board of Review of DHMH affirming Judge Herzing's Order dismissing the hearing scheduled for July 25, 2005, thereby rendering the decision of the Secretary final.

The Department filed a motion to dismiss on February 21, 2006, claiming that appellant was not entitled to judicial review of the agency's decision. It averred that, under the APA, S.G. § 10–201 *et seq.*, only contested cases are afforded review, and "Ms. Massa's admission to the Holly Center is not a contested case...." Further, the Department asserted that "federal law does not create a right to admission to a SRC, only a right to choose [ICFMR] placement over home and community based services." It also argued that "placement in a SRC is not a privilege that is guaranteed by statute or constitution to be determined only after an opportunity for an agency hearing."

In her opposition, appellant asserted: (1) Ms. Massa has a right to admission to a SRC under H.G. § 7–502; (2) Ms. Massa has a right to admission to a SRC under federal Medicaid law; (3) appellant is entitled to procedural due process, which requires an opportunity to be heard; and (4) the Department's "statutory construction of the Maryland Administrative Procedure Act (APA) foreclose[d] any judicial review of [the Department's] arbitrary denial of a statutory entitlement."

By "Order" dated March 20, 2006, the court granted the Department's motion.[16]

## DISCUSSION

### I.

Appellant complains that "[t]he Secretary's denial of Ms. Massa's admission to a SRC constitutes a wholesale denial of

---

16. The record does not reflect that there was a hearing on the petition or an opinion of the court.

her federal right to choose between an ICF–MR and place-
ment in the community." In her view, the State's practice of
offering out-of-state placements to Medicaid beneficiaries, at
State expense, "violates the freedom of choice requirement of
federal Medicaid law," by which eligible individuals may opt to
receive care in an institution.

Characterizing as "disingenuous" appellee's claim that deni-
al of admission to a SRC is not denial of admission to an ICF–
MR, appellant asserts:

> [I]n the *very same letter* denying Ms. Massa's admission to
> an ICF/MR, Holly Center, Secretary McCann stated, *"Ms.*
> *Massa could choose to receive residential services in an*
> *institution rather than the community."* ... Secretary
> McCann's letter continues, *"I want to be clear that I am not*
> *denying Ms. Massa's right to choose to be served in an*
> *ICF–MR."* ... At the hearing before the Board of Review,
> the State similarly stated that federal law does not create a
> right to SRC admission, only a right to choose ICF–MR
> placement over home and community-based services. How-
> ever, Holly Center *is* licensed as an ICF–MR. In fact, the
> only ICF–MRs in Maryland are also registered as
> SRCs.... [ ] Secretary McCann has done precisely the
> opposite of what his letter purports, in direct violation of
> federal law.

(Internal citations omitted; emphasis in original.)

Appellant explains that she chose to apply for Ms. Massa's
admission to Holly Center "because it is a relatively short
drive from her house in Ocean City." She notes that if Ms.
Massa were to be institutionalized in a facility outside the
state, as the State suggests, it would be "virtually impossible
... to continue to be a part of [her] life." Appellant contin-
ues:

> The proposition that the parent or guardian of a severely
> mentally retarded individual in Maryland is given a legiti-
> mate choice between an institutional or community place-
> ment by being offered an ICF–MR placement in New York,
> California, Wyoming, or any other state in the country is

wholly impractical and an inappropriate burden upon the parents' or guardians' exercise of a federal statutory right. Surely Congress could not have intended that "feasible alternatives" in the Medicaid statute, *see* 42 U.S.C. § 1396n(c)(2)(C), include sending a mentally retarded relative or loved one to another state.

In addition, appellant challenges the constitutionality of H.G. §§ 7-503 and 7-504. In her view, the statute deprives appellant and Ms. Massa of "any due process," and "forecloses any review of the secretary's denial of SRC admission." According to appellant, their due process rights were triggered because Ms. Massa has a "property interest" with respect to her claim of entitlement to a benefit—admission to a SRC. Noting that, "[u]nder federal Medicaid law, the State of Maryland must offer Ms. Massa the choice of community or institutional care," appellant insists that she "has a constitutional due process right to be heard on the merits," and claims that the State cannot deny "the choice of community or institutional care ... absent a meaningful opportunity to be heard."

Further, appellant argues:

[B]efore the Board of Review, the Department made the entirely conclusory argument that "where Ms. Massa's admission was denied, due process only requires a hearing when the State seeks to deprive an individual of a liberty or property interest" and "Ms. Massa does not have a liberty or property interest in being admitted to a [s]tate residential center." According to the Department, no court has the right to review either the merits of the Secretary's letter ruling denying SRC admission, [the ALJ's] one-sentence order dismissing the hearing scheduled for July 26, 2005, or the Board of Review's one-sentence decision affirming the ALJ's dismissal of the hearing. Furthermore, the Department continues to attempt to use its proposed out-of-state alternative ... to foreclose any review of the Secretary's denial of SRC admission. This lack of *any meaningful opportunity* to be heard *before* or *after* the Secretary's denial of SRC admission wholly deprives Ms. Massa of her property interest in SRC care without procedural due pro-

cess as the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights require.

(Emphasis in original; citations omitted.)

Ms. Reese elaborates:

Ms. Massa is a profoundly mentally retarded citizen of Maryland for whom there is no "less restrictive setting" to receive residential services than an SRC ... If Ms. Reese had ever been given an opportunity to present the facts of her ward's medical and living conditions, it would be clear to the State that Ms. Massa has a legitimate claim of entitlement to SRC admission. However, the Board of Review failed to consider the brief filed on behalf of Ms. Reese and Ms. Massa ... and affirmed [the ALJ's] order without any knowledge of the relevant facts. Moreover, the State had already determined that Ms. Massa was eligible for SRC admission, as she had resided at Great Oaks for more than two decades until it closed in 1996 ... It is absurd for the State to claim that she is less eligible for SRC care than when she resided at Great Oaks, when she was years younger and had not yet undergone major surgery.[17]

\* \* \*

Section 7–503 provides for a hearing only in the event of the Secretary's grant of SRC admission.... Section 7–504 provides for judicial review of a hearing officer's findings upon the Secretary's grant of SRC admission.... This statutory scheme, and the State's interpretation of it, results in *no review whatsoever* for a severely mentally retarded individual who has been denied admission to present evidence to dispute the Secretary's finding that a less restrictive setting than a SRC is appropriate.

(Emphasis in brief.)

In addition, Ms. Reese complains that appellee failed to provide Medicaid services to Ms. Massa with "reasonable promptness," as required by federal law. She points out that

---

17. Appellant does not raise an equal protection claim with respect to the rights afforded to those who are admitted to a SRC.

Ms. Massa applied for admission to Holly Center in October 2004, and currently "remains at a wholly-inadequate facility in the community where her medical needs continue to be neglected, and because of their severity, cannot be met."

According to the Department, "The only issue properly before this Court is the Department's determination that Ms. Reese was not entitled to a hearing on the Secretary's denial of her request for the admission of Ms. Massa to Holly Center." With respect to the statutory scheme, it posits that there is no provision for a hearing if the Secretary derives admission to a SRC, and asks us to affirm the denial of a hearing.

In reaching its conclusion, the Department maintains that the denial of a request for admission to a SRC "is not a contested case required to be decided only after an opportunity for a hearing." Appellee explains:

> The APA defines a contested case as "a proceeding before an agency to determine … a right, duty, entitlement, or privilege of a person that is required by law to be determined only after an agency hearing." Md.Code Ann., State Gov't § 10–202(d)(1). Contested case proceedings typically require the agency decision to be made using "trial-type" procedures like those contained in the APA. *See Sugarloaf Citizen's Ass'n v. Northeast Maryland Waste Disposal Authority,* 323 Md. 641, 651[, 594 A.2d 1115] (1991); *Dozier [v. Department of Human Resources],* 164 Md.App. [526] at 535[, 883 A.2d 1025 (2005)]. Section 7–502(b) of the Health–General Article contains no such requirements. It only requires the secretary to deny admission if the individual does not meet admission criteria.

Moreover, appellee asserts "that a party is entitled to an adjudicatory hearing only if a statute, regulation or constitutional due process requires such a hearing." It claims: "The statutes governing admissions to SRCs do not provide a hearing when the Secretary denies admission, and the Constitution does not require one." In the Department's view, "Due process requires a hearing only when the state seeks to

deprive an individual of a liberty or property interest," and Ms. Massa has neither a liberty nor a property interest in admission to a SRC. While recognizing that Ms. Massa may wish to reside in a SRC, appellee contends that she "has no legitimate claim of entitlement to that place of residence."

Further, the Department disputes appellant's argument that, without a hearing, she had no opportunity for review of the Secretary's decision. Appellee asserts: " '[C]ourts are vested with the inherent residual right to review and restrain improper exercises of administrative powers by agencies alleged to have acted arbitrarily, illegally, capriciously and unreasonably.' " (Citation omitted.) According to the Department, appellant "did not invoke that 'inherent residual right to review,' . . . choosing instead to challenge the lack of a hearing." [18]

The Department also maintains that "[t]he denial of Ms. Massa's request for admission to a State Residential Center did not violate her rights under federal law" to choose an institutional placement; it claims that, "[u]nder Maryland law, an individual cannot simply choose to reside at a SRC." [19] Appellee adds: "a Medicaid recipient does not have the right to choose among available providers." Rather, appellee insists that Ms. Reese could have pursued placement in an out-of-state institution. Claiming that "[t]here is nothing in the record to suggest that Ms. Reese has tried to locate another institution or that the Department has refused to pay for care at another institution," the Department urges that "there is no basis for concluding that Maryland has not complied with the [choice] requirements of the Medicaid statute." In this regard the Department states:

---

**18.** Appellee does not specify the procedure that appellant could have followed to obtain judicial review of the agency's decision.

**19.** The Department also points out that appellant "may not have the right unilaterally to choose to move her ward to an institution," because Md.Code (2001 Repl., 2006 Supp.), § 13–708(b)(2) of the Estates and Trust Article requires a guardian to obtain "court authorization for any change in the classification of abode." This issue was not litigated below and is not properly before us.

The Secretary, in his letter denying Ms. Massa'[s] request for admission to Holly Center, acknowledged that Ms. Massa, as a Waiver Program participant, had the right to choose to live in an institution and offered assistance to Ms. Reese in locating an institution for her ward. To date, Ms. Reese has not requested such assistance. Instead, she insists that Ms. Massa has a right to reside at Holly Center, a SRC. She is mistaken.

The Department also relies on Maryland's policy of favoring community placements over institutionalization. It points out that the Legislature "has plainly expressed its preference" for serving mentally retarded individuals in the community, rather than in institutions. To that end, notes appellee, the statute limits admission to state-run institutions by "setting strict admission requirements and requiring the Department to demonstrate by clear and convincing evidence to a hearing officer that each admission is appropriate."

The Department also disagrees with appellant's contention that it has failed to provide Ms. Massa with services with "reasonable promptness." In the Department's view, this contention is "based on a misreading of the statute." It explains:

> The Medicaid statute defines "medical assistance" as the "payment of part or all of the cost" of particular services, 42 U.S.C. § 1396d(a), and requires that states furnish such "medical assistance" with reasonable promptness, *id.* § 1396a(a)(8). Thus, the statute requires prompt payment, not prompt services. *Mandy R. v. Owens,* 464 F.3d 1139, 1146 (10th Cir.2006); *Westside Mothers v. Olszewski,* 454 F.3d 532, 540 (6th Cir.2006); *Bruggeman v. Blagojevich,* 324 F.3d 906, 910 (7th Cir.2003). Ms. Reese has not made any claim that Maryland has failed to pay for services required by Ms. Massa.

In reply, appellant reiterates that the State is required to admit to a SRC an individual who meets the specified criteria. This entitlement, in appellant's view, confers upon appellant a right to a hearing before denying the entitlement, even if the

statute governing admittance to a SRC does not provide for such a hearing. Appellant states:

[T]he entitlement to admittance to an SRC is triggered here because Ms. Massa meets all of the[ ] criteria enumerated by the statute ... Ms. Massa is a severely mentally retarded individual for whom there is no less restrictive setting to receive residential services than an SRC. Because Ms. Massa is statutorily entitled to admission, the State must first satisfy her due process right to a hearing before denying Ms. Massa that benefit to which she is entitled.

Appellant adds: "Once there is a due process right, whether the statute provides for a hearing is irrelevant ... The relevant question is not whether a statute provides for a hearing, but whether, having granted someone an entitlement that constitutes a property right, the state can deny that right absent a hearing."

Moreover, appellant maintains that, when the Department argues that Ms. Massa has an "inherent residual right to review" in the courts, it "confuse[s] the right to a hearing with the right to appellate review." Although appellant agrees with the Department that, "in cases where the APA does not provide for appellate review, courts still retain an inherent residual right to review" agency actions, appellant points out that "Ms. Massa is not attempting to have a court review the decision of the Secretary; rather Ms. Massa merely is arguing that she is entitled to a hearing *prior* to the Secretary deciding her case." Accordingly, she maintains: "[W]hether courts can review the Secretary's decision via the residual right power is immaterial to Ms. Massa's current claim."

In addition, appellant contends that, in "two important respects," the Department has "misconstrued Ms. Massa's argument regarding the [Department's] delay in deciding her case." First, appellant disagrees with the Department's assertion that Ms. Massa has chosen to reside in a SRC even though she does not meet the admission requirements. She asserts: "Ms. Massa is not merely choosing to reside at an SRC, but instead, due to her many conditions, the statements

of her care providers, and other evidence, she is *entitled* to reside in an SRC." Second, appellant disagrees with the Department's argument that Medicaid's "reasonable promptness" requirement only concerns payment for services, rather than the provision of services. She contends: "[I]t is clear that the corresponding regulations provide that Medicaid services must be provided promptly and without delay."

## II.

Title 7 of the Health–General Article is captioned "Developmental Disabilities Law." Subtitle 5 is captioned "State Residential Centers for Individuals with Mental Retardation." The statutory scheme relating to admission and confinement at a SRC is codified at H.G. §§ 7–501 to 7–508. Preliminarily, the Secretary has the sole responsibility to determine whether an individual meets the entrance criteria for SRC placement. The statute does not provide for a hearing at which the applicant for admission to a SRC may present his or her case prior to the Secretary's decision.

As our review of the statutory scheme reveals, the Secretary may not approve admission to a SRC if "[t]here is a less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time." H.G. § 7–502(b)(2). If the Secretary approves admission, however, § 7–503 requires a hearing within 21 days of admission to the SRC, conducted by a hearing officer of the Department, at which the Department must prove, by clear and convincing evidence, that the individual meets the statutory requirements for admission. *See* H.G. §§ 7–502, 7–503.[20] Notably, if the Secretary deter-

---

**20.** H.G. § § 7–502 and 7–503 are set forth on pages 113 and 115, 934 A.2d 1015 and 1016, *supra*. For convenience of the reader, we shall again set forth portions of the statutory text:

 **§ 7–502. Admission.**

 (a) *Approval by Secretary.*—The Secretary shall approve the admission of an individual to a State residential center only if:

 (1) The findings of the evaluation are that the individual:

 (i) Has mental retardation; and

mines that the individual does *not* meet the criteria for admission to a SRC, the statute does not provide the applicant with any recourse to contest that determination. In effect, then, the statute clothes the Secretary with the unilateral right to determine that an applicant is ineligible for admission to a SRC.

After the Secretary determined that Ms. Massa did not qualify for admission to a SRC under H.G. § 7–502(a), appellant sought review of the Secretary's decision before the OAH, the Board, and the circuit court. On each occasion, she was not provided with a forum to be heard in regard to the merits of her request to admit Ms. Massa to a SRC.

As a condition of Maryland's participation in Medicaid, the State must certify to the federal government that it provides eligible individuals with the choice of receiving care in the community or in an institution, including an intermediate care facility for the mentally retarded (ICF–MR). *See* 42 U.S.C.

---

(ii) For adequate habilitation, needs residential services; and

(2) There is no less restrictive setting in which the needed services can be provided and that is available to the individual or will be available to the individual within a reasonable time.

(b) *When Secretary may not approve.*—The Secretary may not approve the admission of an individual to a State residential center if:

(1) The findings of the evaluation are that the individual:

(i) Does not have mental retardation; or

(ii) Has mental retardation but does not need residential services for adequate habilitation; or

(2) There is a less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time. . . .

§ 7–503. Hearings; notice.

\* \* \*

(e) *Findings supporting admission.*—(1) At the hearing, in order to certify the admission of the individual, it must be affirmatively shown by clear and convincing evidence that the conclusions leading to the decision to admit the individual are supported by the following findings:

(i) The individual has mental retardation;

(ii) The individual needs residential services for the individual's adequate habilitation; and

(iii) There is no less restrictive setting in which the needed services can be provided that is available to the individual or will be available to the individual within a reasonable time after the hearing.

§ 1396n(c)(2)(C); *see also* 42 C.F.R. § 441.302(d). Secretary McCann acknowledged as much in his letter to appellant.

In the first instance, appellant contends, in effect, that the Department's willingness to place Ms. Massa in an out-of-state residential facility, but not in a SRC, constituted a veiled attempt at an end-run around the federal and State choice requirements. We disagree.

The Secretary expressly advised that "Ms. Massa could choose to receive residential services in an institution rather than the community," and claimed he was "not denying Ms. Massa's right to choose to be served in an ICF–MR," although he was denying Ms. Massa's "admission to a State residential center." He explained that Ms. Massa could be placed at a facility in another state, at State expense. To be sure, it is understandable that appellant would prefer placement in an institution located in Maryland, so that she can continue to have close contact with Ms. Massa. But, having found Ms. Massa ineligible for admission to a SRC, the Department's willingness to pay for an out-of-state institutional placement does not amount to "illusory" compliance with the federal choice requirement.

What remains, of course, is the larger question of appellant's rights, if any, to be heard in regard to the Secretary's determination that Ms. Massa did not qualify for admission to a SRC.

As we have observed, the Maryland statute does not provide for a mechanism to challenge the Secretary's denial of admission to a SRC. For that reason, appellee contends that the matter is not a "contested case" under the APA, and therefore appellant had no right to an OAH hearing, a hearing before the Board, or traditional judicial review of an administrative agency action. Moreover, appellee insists that due process does not require such a hearing.

S.G. § 10–202(d)(1) defines a "contested case," in pertinent part, as "a proceeding before an agency to determine: (i) a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution *to be determined only*

*after an opportunity for an agency hearing . . . ."* (Emphasis added.) *See Modular Closet Systems, Inc. v. Comptroller of the Treasury,* 315 Md. 438, 444, 554 A.2d 1221 (1989) (defining "contested case" to include only those disputes that, by their nature, entitle a party to an agency hearing, regardless of whether a hearing was actually held); *State Dep't of Assessments & Taxation v. Clark,* 281 Md. 385, 395–96, 380 A.2d 28 (1977) (stating that the definition of a "contested case" in the APA contemplates only those proceedings in which a party is entitled to an agency hearing); *Md. Pharmacists Ass'n, Inc. v. Office of the Attorney Gen.,* 115 Md.App. 650, 656, 694 A.2d 492 (explaining that a "contested case" is "a proceeding before, or a dispute with, an agency that entitles a party to an agency hearing"), *cert. denied,* 347 Md. 154, 699 A.2d 1168 (1997).

S.G. § 10–222 provides, with certain exceptions, that "a party who is aggrieved by the final decision [of an administrative agency] *in a contested case* is entitled to judicial review of the decision as provided in this section." (Emphasis added.) Maryland Rule 7–201(a) is also pertinent. It states, in part: "The rules in this Chapter govern actions for judicial review of (1) an order or action of an administrative agency, *where judicial review is authorized by statute . . . ."* (Emphasis added.) Moreover, S.G. § 10–223(b)(1) states: "A party who is aggrieved by a final judgment of a circuit court under this subtitle may appeal to the Court of Special Appeals in the manner that [the] law provides for appeal of civil cases."

An administrative agency's action is generally subject to judicial review only when there is "a legislative grant of the right to seek judicial review." *Harvey v. Marshall,* 389 Md. 243, 273, 884 A.2d 1171 (2005); *Public Service Comm'n v. Wilson,* 389 Md. 27, 89 n. 39, 882 A.2d 849 (2005) (recognizing that an at-will employee of Public Service Commission is not entitled to judicial review of that agency's final decision to terminate her); *Dozier v. Department of Human Resources,* 164 Md.App. 526, 531, 883 A.2d 1025 (2005) (recognizing that judicial review is permitted only when authorized by statute).

In *Criminal Injuries Comp. Bd. v. Gould,* 273 Md. 486, 500, 331 A.2d 55 (1975), the Court explained that the "right to an appeal is not a right required by due process of law, nor is it an inherent or inalienable right." Rather, "[a]n appellate right is entirely statutory in origin and no person or agency may prosecute such an appeal unless the right is conferred by statute." *Id. See also South Easton Neighborhood Ass'n v. Easton,* 387 Md. 468 n. 3, 876 A.2d 58 (2005).[21]

The Court of Appeals's decision in *Weiner v. Maryland Insurance Administration,* 337 Md. 181, 652 A.2d 125 (1995), elucidates some of the principles discussed above. In that case, a group of pharmacists sought judicial review of a decision of the Commissioner of the Maryland Insurance Administration ("MIA"). By way of background, Blue Cross and Blue Shield of Maryland ("BCBSM"), a non-profit health service plan, filed a form of contract with the MIA for approval pursuant to statutory requirements. The form was a proposed contract between BCBSM and voluntary participating pharmacies for reimbursements for filling prescriptions for members of BCBSM's plans. The MIA approved the form

---

**21.** "[W]hen there is no statutory provision for judicial review of final adjudicatory decisions by administrative agencies, either a certiorari or a mandamus action in the appropriate circuit court is normally available for ordinary 'substantial evidence' judicial review of the adjudicatory administrative decisions." *Bd. of License Commr's v. Corridor Wine, Inc.,* 361 Md. 403, 411, 761 A.2d 916 (2000) (citations omitted) (emphasis added). In this case, however, there was no adjudicatory hearing. An "administrative mandamus" action serves as a substitute for an action for judicial review under Md. Rule 7–201, et seq., when neither statute nor local law creates a right of judicial review of a quasi-judicial order or action of an administrative agency. The Court of Appeals recognized "administrative mandamus" in *Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73 (1945), stating that Maryland courts have the "inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious or unreasonable acts[.]" *See Harvey, supra,* 389 Md. at 275, 884 A.2d 1171; *Murrell v. Mayor and City Council of Baltimore City,* 376 Md. 170, 201, 829 A.2d 548 (2003) (Wilner, J., dissenting); *Md. Transp. Auth. v. King,* 369 Md. 274, 299, 799 A.2d 1246 (2002) (Harrell, J., concurring); *Gould, supra,* 273 Md. at 503, 331 A.2d 55. *See also* Rule 7–401 *et seq.,* governing "actions for judicial review of a quasi-judicial order or action of an administrative agency where review is not expressly authorized by law."

without holding a formal hearing.[22] Thereafter, a number of individual pharmacists and the Maryland Pharmacists Association (collectively the "Pharmacists") requested judicial review in circuit court. The court reviewed the decision on the record, affirming the Associate Commissioner's decision.

On appeal, the Pharmacists argued, *inter alia,* that they were entitled to a full adjudicatory hearing under the APA and by principles of due process. After reviewing the pertinent statutory provisions, the Court of Appeals concluded that the Associate Commissioner was not required to hold a hearing of any type before approving the form. *Id.* at 189, 652 A.2d 125. The Court reasoned, *id.* at 191–92, 652 A.2d 125:

> "[T]he APA itself does not grant a right to a hearing." *Sugarloaf,* 323 Md. at 652, 594 A.2d at 1120. Only a decision in a *contested case* can be challenged through judicial review under the APA. Md.Code (1984, 1993 Repl. Vol., 1994 Cum.Supp.), § 10–222 of the State Government Article. "[T]he mere fact that a statute calls for a hearing is not in and of itself sufficient to make the subject of that hearing a 'contested case.'" *Washington Suburban Sanitary Comm'n v. Donacam Assocs.,* 57 Md.App. 719, 726, 471 A.2d 1097, 1101 (1984), *rev'd on other grounds,* 302 Md. 501, 489 A.2d 26 (1985).

> A contested case is defined as

> "a proceeding before an agency to determine:

> (i) a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing; or

> (ii) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by statute or constitution to be determined only after an opportunity for an agency hearing."

---

**22.** An Associate Commissioner held a proceeding he characterized as "an informal motion hearing." *Id.* at 185, 652 A.2d 125.

Md.Code (1984, 1993 Repl.Vol., 1994 Cum.Supp.), § 10–202(d)(1) of the State Government Article. The proceedings before the Commissioner in this case were to obtain information as to whether the proposed contract form was "unjust, unfair, inequitable, inadequate, misleading, deceptive, or encourage[d] misrepresentations ..." Art. 48A, § 356(a). The proceedings did *not* involve a right, duty, statutory entitlement, privilege or license; therefore, the proceedings were not a contested case under the definition found in Md.Code (1984, 1993 Repl.Vol., 1994 Cum.Supp.), § 10–202(d)(1) of the State Government Article. Hence, the decision was not subject to judicial review under the APA because the proceedings fail to meet the contested case requirement in Md.Code (1984, 1993 Repl.Vol., 1994 Cum. Supp.), § 10–222 of the State Government Article.[ ]

Of import here, the Court also addressed the complaint of a denial of due process in regard to the lack of a hearing. It said:

Finally, Appellants argue that denial of an adjudicatory hearing in this case denied them their right to due process. *We have recognized that "a 'judicial' or 'trial-type' hearing is not a requirement of procedural due process where an administrative agency does not act in a quasi-judicial capacity and the facts to be determined are 'legislative' rather than adjudicative in nature." Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 711, 376 A.2d 483, 497 (1977); *see Sugarloaf,* 323 Md. at 670, 594 A.2d at 1129. "[I]t is the nature of the dispute, rather than the stage of the proceedings, that determines whether or not a matter is a contested case." *Modular Closet Sys., Inc. v. Comptroller of the Treasury,* 315 Md. 438, 444, 554 A.2d 1221, 1224 (1989); *see also Woodward & Lothrop,* 280 Md. at 712, 376 A.2d at 497 ("it is the nature of the decision's fact-finding process, not the ultimate effect of the decision, that determines the party's right to an adjudicatory hearing"). As discussed above, Maryland's appellate courts have consistently treated the Commissioner's authority to approve rates and forms as a quasi-legislative function.

Under *Woodward & Lothrop,* therefore, the failure of the commissioner to grant Appellants' request for an adjudicatory hearing in this case, was not a violation of Appellants' right to due process. The Associate Commissioner did not err in refusing to hold an adjudicatory or quasi-judicial hearing on the Pharmacists' complaints.

*Id.* at 193–94, 652 A.2d 125 (emphasis added).

In this case, appellant had no statutory right to an agency hearing. Therefore, this was not a "contested case" within the meaning of S.G. § 10–202. But, our conclusion that this matter was not a "contested case" under the APA does not end our inquiry.

■ "One of the key elements of a contested case hearing is whether the entity conducting the hearing acts in an adjudicatory capacity, *i.e.* by determining the facts of a case and applying those facts to some legal standard in order to reach a conclusion." *C.S. v. Prince George's County Dept. of Social Services,* 343 Md. 14, 32, 680 A.2d 470 (1996) (citation omitted). Whether a given act or decision of an administrative body is adjudicatory in nature depends upon whether it is "reached on individual, as opposed to general, grounds," and concerns a particular person, property, or entity, and whether "there is a deliberative fact-finding process with testimony and the weighing of evidence." *Md. Overpak Corp. v. Mayor and City Council of Baltimore,* 395 Md. 16, 33 n. 14, 909 A.2d 235 (2006) (also commenting that the terms "quasi-judicial" and "administrative adjudication" are synonymous). *See also Mayor and Council of Rockville v. Woodmont Country Club,* 348 Md. 572, 585, 705 A.2d 301 (1998) (holding that City Council acted in a quasi-judicial capacity when it held a hearing, received written and oral testimony, and considered evidence in determining specific amount of special benefit to a particular piece of property it was assessing); *Armstrong v. Mayor and City Council of Baltimore,* 169 Md.App. 655, 671, 906 A.2d 415 (2006) (holding that a committee of the Baltimore City Council was acting in a quasi-judicial capacity when it held a hearing,

received oral testimony from community members, and engaged in "fact-intensive consideration of a specific property").

Clearly, the Secretary's decision was not "adjudicatory" or "quasi-judicial." Although it was a decision reached on individual grounds about one person's eligibility for admission to a SRC, it was not made by means of a fact-finding process that involved the presentation of evidence. On the other hand, the matter clearly did not involve the resolution of legislative facts, either. In *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 711–712, 376 A.2d 483 (1977), a zoning case, the Court explained the distinction:

> The difference between adjudicative and legislative facts is not easily drawn; Professor Davis says that adjudicative facts are facts about the parties and their activities, businesses and properties. They usually answer the questions "of who did what, where, when, how, why, with what motive or intent" while legislative facts "do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion." Davis, *Treatise*, § 7.02. The difference, broadly speaking, involves whether the decision is to be made on individual or general grounds. Davis, *Treatise*, § 7.04. Simply because an individual has a protected interest does not entitle him to a trial-type hearing where the matter to be determined involves issues of legislative fact.

In *Weiner*, 337 Md. at 186, 652 A.2d 125, the Court said: "It is well settled that a party is entitled to a quasi-judicial hearing before an administrative agency ... if that type of hearing is required by statute or regulation *or mandated by constitutional due process concerns.*" (Emphasis added); *see Sugarloaf Citizens Ass'n v. Northeast Md. Waste Disposal Auth.*, 323 Md. 641, 652, 594 A.2d 1115 (1991) ("It is well established ... that the APA itself does not grant a right to a hearing. That right must come from another source such as a statute, a regulation, or *due process principles.*") (Citations omitted) (Emphasis added.); *Riger v. L & B Ltd. P'ship*, 278 Md. 281, 292 n. 5, 363 A.2d 481 (1976)("the legislature may not constitutionally ... grant a 'property right' conditioned by

less than due process procedures.") (citing *Goss v. Lopez*, 419 U.S. 565, 573–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)). Therefore, we must analyze whether this matter implicates the rights of appellant and/or Ms. Massa.

■ The due process clauses of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights protect an individual's interests in substantive and procedural due process.[23] *See Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. 1, 25–27, 733 A.2d 996 (1999) (discussing substantive due process); *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 508–09, 709 A.2d 142 (1998) (discussing procedural due process); *see also Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, 410 A.2d 1052 (1980); *Knapp v. Smethurst*, 139 Md.App. 676, 703, 779 A.2d 970 (2001); *City of Annapolis v. Rowe*, 123 Md.App. 267, 275–77, 717 A.2d 976 (1998). In general, there are four "categories" of due process actions: "(1) a procedural due process claim premised on the deprivation of a property interest; (2) a procedural due process claim premised on the deprivation of a liberty interest; (3) a substantive due process claim premised on the deprivation of a property interest; and (4) a substantive due process claim premised on the deprivation of a liberty interest." *Samuels v. Tschechtelin*, 135 Md.App. 483, 523, 763 A.2d 209 (2000); *see Superior Court of California, County of Stanislaus v. Ricketts*, 153 Md.App. 281, 336, 836 A.2d 707 (2003). In this case, we are concerned only with the first category.

■ "Procedural due process imposes constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause. . . ." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). One of the objectives of due process is "to ensure that individuals who have property rights are not subject to arbitrary governmental deprivation of those

---

**23.** Article 24 of the Maryland Declaration of Rights and the Due Process Clause of the Fourteenth Amendment are *in pari materia*. *Pickett v. Sears, Roebuck & Co.*, 365 Md. 67, 77, 775 A.2d 1218 (2001).

rights." K.C. Davis & R.J. Pierce, Jr., *Administrative Law Treatise* § 9.4 at 35 (3d ed. 1994).

An important component "of the procedural due process right is the guarantee of an opportunity to be heard and its instrumental corollary, a promise of prior notice.[1]" L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 10–15, at 732 (2d ed. 1988) ("TRIBE"). Indeed, the cases are legion that "the fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (Due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Pickett v. Sears, Roebuck & Company,* 365 Md. 67, 81, 775 A.2d 1218 (2001)(stating that "procedural due process requires that litigants must receive notice, and an opportunity to be heard"); *Roberts,* 349 Md. at 509, 709 A.2d 142 ("At '[t]he core of due process is the right to notice and a meaningful opportunity to be heard.' ") (quoting *LaChance v. Erickson,* 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998)); *see also Attorney Grievance Comm'n v. Fezell,* 361 Md. 234, 246, 760 A.2d 1108 (2000); *Owens v. State,* 352 Md. 663, 697, 724 A.2d 43, *cert. denied,* 527 U.S. 1012, 119 S.Ct. 2354, 144 L.Ed.2d 250 (1999); *Blue Cross of Md., Inc. v. Franklin Square Hosp.,* 277 Md. 93, 101, 352 A.2d 798 (1976); *Maryland Racing Comm'n v. Belotti,* 130 Md.App. 23, 55, 744 A.2d 558 (1999).

 Procedural due process is a flexible concept that "calls for such procedural protection as a particular situation may demand," as "appropriate to the fair determination of the particular issues presented in a given case." *Wagner v. Wagner,* 109 Md.App. 1, 24, 674 A.2d 1, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996); *see Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (noting that "due process is flexible and calls for such procedural protections as the particular situation demands"); *In re Adop-*

*tion/Guardianship No. 6Z970003,* 127 Md.App. 33, 54, 731 A.2d 467 (1999), *overruled in part on other grounds, In re Adoption/Guardianship No. T97036005,* 358 Md. 1, 16, 746 A.2d 379 (2000). Put another way, "the concept of due process is not static—the process that is due may change according to the circumstances." *Miserandino v. Resort Prop., Inc.,* 345 Md. 43, 65, 691 A.2d 208, *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 292, and *cert. denied sub nom., Commonwealth Sec'y v. Miserandino,* 522 U.S. 963, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997); *see Sullivan v. Insurance Comm'r,* 291 Md. 277, 283–85, 434 A.2d 1024 (1981); *Drolsum v. Horne,* 114 Md.App. 704, 713, 691 A.2d 742 (stating that due process is met when "there is at some stage an opportunity to be heard suitable to the occasion"), *cert. denied,* 346 Md. 239, 695 A.2d 1227 (1997).[24]

In *Roberts,* the Court of Appeals said, 349 Md. at 509, 709 A.2d 142:

Due process ... is not a rigid concept. As this Court stated in *Department of Transportation v. Armacost,* 299 Md. 392, 416, 474 A.2d 191, 203 (1984), "[d]ue process does not require adherence to any particular procedure. On the contrary, due process is flexible and calls only for such procedural protections as the particular situation demands." Thus, in determining what process is due, the Court will "balanc[e] the private and government interests affected." 299 Md. at 416–20, 474 A.2d at 203–05. According to the Supreme Court *(Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976)):

"[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the

---

**24.** "[T]here is no requirement that actual prejudice be shown before denial of due process can be established." *Wagner,* 109 Md.App. at 24, 674 A.2d 1; *see Town of Somerset v. Montgomery County Bd. of Appeals,* 245 Md. 52, 66, 225 A.2d 294 (1966).

probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." [25]

■ In *Pickett,* 365 Md. at 78, 775 A.2d 1218, the Court of Appeals explained that, "[i]n order to properly challenge state action as a violation of procedural due process, the party challenging the action must show that the state acted to deprive the complainant of a property interest encompassed by the language of the due process clause." (citing *Fuentes v. Shevin,* 407 U.S. 67, 84, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)). If the court determines that "State action deprived an individual of a protected property interest, the Court must balance the interests of all parties to the matter in order to determine the level of procedural due process which is constitutionally required under the circumstances." *Id.; see Tulsa Prof'l. Collection Services, Inc. v. Pope,* 485 U.S. 478, 484, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988); *Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

■ Therefore, to prevail in an action alleging a denial of procedural due process, "a plaintiff must demonstrate that he had a protected property interest, that he was deprived of that interest [by the State], and that he was afforded less procedure than was due." *Samuels,* 135 Md.App. at 523, 763 A.2d 209; *see Pope,* 485 U.S. at 484–86, 108 S.Ct. 1340; *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–41, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Roberts,* 349 Md. at 510–11, 709 A.2d 142; *Golden Sands Club Condominium, Inc. v. Waller,* 313 Md. 484, 488 n. 4, 545 A.2d 1332 (1988); *Department of Transportation v. Armacost,* 299 Md. 392, 416, 474 A.2d 191 (1984); *Rowe,* 123

---

**25.** Here, it would seem that affording appellant a contested case hearing would not impose an undue administrative burden on the State; the same procedures employed to review the Secretary's decision granting admission to a SRC could just as easily be utilized in regard to the review of a decision denying admission to a SRC.

Md.App. at 275–76, 717 A.2d 976; *Regan v. Board of Chiropractic Examiners*, 120 Md.App. 494, 510, 707 A.2d 891 (1998), *aff'd*, 355 Md. 397, 735 A.2d 991 (1999); Tribe, § 10–8 at 680.

Property is an " 'interest or estate which the law regards of sufficient value for judicial recognition.' " *Dodds v. Shamer*, 339 Md. 540, 548, 663 A.2d 1318 (1995) (citation omitted). Generally, the common law concept of property refers to the right and interest a person has in an object, which extends beyond ownership and possession to include the lawful, unrestricted right of use, enjoyment, and disposal of the object. 63 Am.Jur.2d *Property* § 1, at 66 (1997). A protected property interest can take a number of forms and is not "uniform." *Dodds*, 339 Md. at 549, 663 A.2d 1318. It includes tangible as well as intangible property. *See, e.g., Dodds*, 339 Md. at 549–52, 663 A.2d 1318 (liquor license); *St. George Antiochian Orthodox Christian Church v. Aggarwal*, 326 Md. 90, 603 A.2d 484 (1992) (foreclosure of right of redemption of real property).

To illustrate, an employee ordinarily has a protected property interest in the economic benefits of his employment. *Rowe*, 123 Md.App. at 292, 717 A.2d 976. But, due process rights "do not hinge on receipt of monetary benefits." *Id.* at 287, 717 A.2d 976. *See, e.g., Goss*, 419 U.S. at 574, 95 S.Ct. 729 (students suspended for 10 days without a hearing); *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (prisoners' loss of good time credit); *Morrissey, supra*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (revocation of parole).

In the case *sub judice*, the denial of admission to a SRC constituted State action. Therefore, we focus our inquiry on whether appellant was deprived of a "substantial interest in property."

Under the State's analysis, appellant had no right to present evidence to dispute the Secretary's finding that appellant did not meet the eligibility criteria for admission to a SRC. In the proceedings below, as in its brief, the Department argued that "due process only requires a hearing when the State seeks to deprive an individual of a liberty or a property

interest," but it claims that "Ms. Massa does not have a liberty or property interest in being admitted to a State residential center." While the State provides a hearing to those for whom it seeks admission to a SRC, it is of the view that a developmentally disabled person has no cognizable legal interest in disputing the denial of admission to a SRC. It claims that neither the disabled person nor the guardian has a right to challenge such a potentially monumental ruling, even though, among other things, the consequence of such a decision could result in an institutional placement (under the Medicaid choice option) in a state located 3000 miles away, making it virtually impossible for the parent or guardian to remain involved in the life of the disabled person.

■ We agree with appellant that she was entitled to a hearing, at which she could attempt to demonstrate that Ms. Massa's needs warrant admission to a SRC, and satisfy the statutory criteria set forth in H.G. § 7–502. We explain.

In *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court held that an untenured college professor did not have a property interest in continued employment, "sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." *Id.* The *Roth* Court recognized that the professor "surely had an abstract concern in being rehired. . . ." *Id.* at 578, 92 S.Ct. 2701. In discussing the concept of a protected property interest in a benefit, the Court said, *id.* at 577, 92 S.Ct. 2701: "To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." The Supreme Court explained, *id.:*

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that supports claims of entitlement to those benefits.

In *Riger, supra,* 278 Md. 281, 363 A.2d 481, Judge Eldridge, speaking for the Court of Appeals, summarized several important due process decisions with regard to benefits, stating, *id.* at 291–92, 363 A.2d 481:

Various types of benefits under federal and state statutes have been held to constitute "property" subject to procedural due process requirements. For example, in *Goldberg v. Kelly, supra,* [397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)] the entitlement to welfare benefits pursuant to federal and state programs was held to be "property," with the further holding that such benefits could not be stopped without a pre-termination hearing. In *Bell v. Burson, supra,* [402 U.S. 535, 539–540, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971)] the entitlement to a driver's license under state law was deemed "property" for due process purposes. In *Goss v. Lopez, supra,* [419 U.S. 565, 576, 95 S.Ct. 729 (1975)] the Court held that a pupil's interest in attending public school was "property," and that the pupil could not be suspended for even a relatively short period absent some form of notice and hearing. The Court in *Mathews v. Eldridge, supra,* 424 U.S. at 332, 96 S.Ct. at 901, held "that the interest of an individual in continued receipt of [social security disability] benefits is a statutorily created 'property' interest protected by the Fifth Amendment." And in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court held that a public employee's interest in retaining his job, where the statute required "cause" for removal, was a "property" interest, and that therefore the public employee could be removed only by procedures meeting due process standards.[ ]

Joined by Chief Justice Rehnquist and Justice Scalia in her dissent in *Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987), Justice O'Connor's summary of the law of statutory entitlements is also instructive.[26] Justice

---

26. In *Allen,* the majority determined that language in a Montana parole statute was mandatory in nature, thus creating a liberty interest protect-

O'Connor pointed to the importance of analyzing the amount of discretion afforded to a decisionmaker in determining whether a statute creates a protected statutory entitlement. She said, *id.* at 382, 107 S.Ct. 2415:

The *Roth* decision teaches that a mere expectation of a benefit—even if that expectation is supported by consistent government practice—is not sufficient to create an interest protected by procedural due process. Instead, *the statute at issue must create an entitlement to the benefit before procedural due process rights are triggered.* In my view, the distinction between an "entitlement" and a mere "expectancy" must necessarily depend on the degree to which the decisionmakers' discretion is constrained by law. An individual simply has nothing more than a mere hope of receiving a benefit unless the decision to confer that benefit is in a real sense channeled by law. Because the crucial inquiry in determining the creation of a protected interest is whether a statutory *entitlement* is created, it cannot be sufficient merely to point to the existence of some "standard." Instead, *to give rise to a protected liberty interest, the statute must act to limit meaningfully the discretion of the decisionmakers.* In the administrative law context we have long recognized that some purported standards " 'are drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1 st Sess., 26 (1945)). Accordingly, we have held that some agency action is committed to agency discretion within the meaning of the Administrative Procedure Act; as a result, agency action is not subject to judicial review if "no judicially manageable standards are available for judging how and when an agency should exer-

---

ed by due process. The dissent disagreed with the majority's interpretation of the statute, stating: "[T]he Court has abandoned the essential inquiry in determining whether a statute creates a liberty interest. Instead of requiring particularized standards that actually constrain the discretion of the relevant decisionmakers, the Court is satisfied simply by the presence of a purported 'standard.' " *Id.* at 385, 107 S.Ct. 2415.

cise its discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). It is no less critical in determining whether a statute creates a protected liberty interest to consider whether the statute includes standards that place real limits on decisionmaker discretion.

(Emphasis added.)

 Thus, discretionary statutory "rights," as compared to mandatory rights, do not create protected liberty or property interests under the Due Process clause. *See Smith v. Ashcroft,* 295 F.3d 425, 431 (4th Cir.2002) (holding appellant had "no liberty or property interest in a discretionary waiver of deportability"); *Appiah v. INS,* 202 F.3d 704 (4th Cir.2000) (holding that because suspension of deportation is discretionary, it does not create a liberty or property interest protected by the Due Process Clause), *cert. denied,* 531 U.S. 857, 121 S.Ct. 140, 148 L.Ed.2d 92 (2000); *Gardner v. City of Baltimore Mayor and City Council,* 969 F.2d 63, 68 (4th Cir.1992) (plaintiff had no legitimate claim of entitlement to issuance of a public works agreement when state and municipal law accorded the city discretion to refuse to issue the agreement); *Guerra v. Scruggs,* 942 F.2d 270, 278 (4th Cir.1991) (holding that because Army had discretion to discharge enlisted personnel, a service member had no property interest in continued employment with Army). *Compare Daniels v. Woodbury County,* 742 F.2d 1128, 1132 (8th Cir.1984) (mandatory language in general relief statute created a "legitimate claim of entitlement and expectancy of benefits in persons who claim to meet the eligibility requirements") (citations and internal quotations omitted); *Griffeth v. Detrich,* 603 F.2d 118, 121 (9th Cir.1979) (state code using mandatory language requiring localities to provide general relief, combined with county regulations providing detailed, objective eligibility criteria, restrict the discretion of intake eligibility workers and create legitimate expectations of receipt in those who meet those standards) *cert. denied sub nom. Peer v. Griffeth,* 445 U.S. 970, 100 S.Ct. 1348, 64 L.Ed.2d 247 (1980); *Giaimo v. City of New Haven,* 257 Conn. 481, 778 A.2d 33, 46–47 (2001) (" 'A statute or ordinance providing procedural guarantees does not create

a constitutionally protected property interest unless it sets forth substantive criteria that limit the discretion of the decisionmaking body.' ") (citation omitted).

Appellant relies upon *Mallette v. Arlington County Employees' Supplemental Ret. Sys. II*, 91 F.3d 630 (4th Cir.1996). In that case, a former county employee, Mallette, applied for service-related disability retirement benefits. The county code, codifying the benefits, provided that "any member ... may at any time prior to his normal retirement date retire on account of service-connected disability that is not due to the employee's willful misconduct." *Id.* at 635 (citation omitted). The ordinance directed payment of benefits "once a medical examining board ... certified that the disability (1) is permanent; (2) incapacitates the employee for his or her duties; and (3) resulted from an accident or injury that occurred in actual performance of a duty." *Id.* Employees with a pre-employment disability were still eligible for service-connected disability benefits, provided that the board found that the employee would have been entitled to the benefits notwithstanding the pre-employment injury. The code also provided that any member meeting the requirements "shall receive" the benefits. *Id.*

Mallette had a long history of severe back pain. But, following surgery her condition improved greatly, and she was able to engage in normal activity. After the surgery, Mallette accepted a part-time position with Arlington County, at which point she informed the county of her past medical history and passed a pre-employment physical examination. Mallette later accepted a full-time position, which enabled her to participate in the county's employee retirement plan. Mallette then suffered injuries in an automobile accident while on duty. After receiving the statutory maximum in worker's compensation benefits, the county notified Mallette that the retirement system would begin paying benefits.

According to Mallette, conversations with county employees led her to believe that the county would convert her worker's compensation benefits to retirement benefits "as a matter of

course." *Id.* at 633. Mallette submitted an application for service-connected disability retirement benefits. A physician for the retirement system examined Mallette and concluded that she was eligible for service-connected disability retirement benefits. Mallette appeared at the county retirement board's hearing on Mallette's application, at which time she was provided with a revised medical report, in which the physician reversed his conclusion; he stated that "it was not medically certain that [Mallette's] automobile accident was the 'sole reason for her to be on job-connected disability without any pre-existing condition.'" *Id.* Mallette submitted a written statement at the hearing. The retirement board subsequently denied Mallette's claim for service-connected disability retirement benefits.

Mallette appealed, arguing that she was not provided a full hearing because the Board gave her no opportunity to question the physician or the system administrator. The county argued that, because the board found that Mallette did not meet the eligibility requirements for the retirement benefits, she had no property interest in those benefits. The Fourth Circuit rejected that argument, stating that the county "confuse[d] the right to receive a benefit with the right to fair decision-making before a benefit is denied." *Id.* at 637 (citation omitted). The Fourth Circuit reasoned:

> Under the County's approach, any adverse decision on the merits would insulate it from the obligation to provide due process. Conversely, no employee could have a property interest triggering due process unless the agency had already awarded them the benefit—a convenient result for the County—but one that conflicts with the law. The Supreme Court has explained that a person may hold a property interest in a benefit even before it has been determined that she is, in fact, eligible for the benefit.
>
> > A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and *that he may invoke at a hearing.*

*Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699–700, 33 L.Ed.2d 570 (1972) (emphasis added). By the same token, "[t]he right to be heard does not depend upon an advance showing that one will surely prevail at the hearing." *Fuentes v. Shevin,* 407 U.S. 67, 87, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972). In *Goldberg v. Kelly,* the Court held that welfare claimants "had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them," and thus had a right to due process, even though "[t]he recipients had not yet shown that they were, in fact, within the statutory terms of eligibility." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709 (citing *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). Just as the plaintiffs in *Goldberg* were not required to show that they would prevail on the merits before they were entitled to due process, Mallette need not prove that her injury meets County standards to rightfully claim a modicum of procedural fairness. *We hold that Mallette has a property interest in her potential eligibility for disability retirement benefits, whether or not she ultimately prevails on the merits.*

(Emphasis added.)

Having decided that due process applied to Mallette's application for benefits, the court focused its analysis on what process was due. Ultimately, the Fourth Circuit reversed and remanded, "[b]ecause [it found] sufficient evidence in the record to suggest that Mallette did not receive notice 'reasonably calculated' to afford her a meaningful opportunity to present her side at the hearing. . . ." *Id.* at 641. On remand, it instructed the district court to "apply the *Mathews* balancing test to evaluate whether the process accorded Mallette was constitutionally adequate, taking into account, where appropriate, any avenues of relief that were available to her under Virginia law." *Id.*

According to appellant, "just as in *Mallette,* Ms. Massa need not 'prove that her injury meets [the State's] standards to rightfully claim a modicum of procedural fairness.'" Appellant argues:

[T]he State relies on the same tautology squarely rejected by the Fourth Circuit in *Mallette*. The State claims Ms. Massa has no due process right because, in part, the Secretary has already denied her entrance and thus she can have "no legitimate claim of entitlement to that place of residence." ... Thus, the State's argument boils down to the proposition that, because it has denied Ms. Massa entrance to the SRC, she is not entitled to any appeal of such a decision because it has already denied her entrance. As shown, that argument and the procedure it endorses run afoul of due process.

*See also Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir.1994) (when a plaintiff looks to state law to provide a basis for a property interest, "[a] reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms.") (citation omitted); *Jacobs, Visconsi & Jacobs v. City of Lawrence*, 927 F.2d 1111, 1116 (10th Cir.1991) ("When analyzing whether a plaintiff presents a legitimate claim of entitlement, we focus on the degree of discretion given the decisionmaker and not on the probability of the decision's favorable outcome."[1]) (citing *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)); *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir.1990) (expectation of entitlement, sufficient to create a property interest, depends "largely upon the extent to which the statute contains mandatory language that restricts the discretion of the [decisionmaker].") (citing *Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir.1980)).

We consider salient the lack of discretion afforded to the Secretary in regard to an application for admission to a SRC. H.G. § 7–502 *requires* the Secretary to apply certain particularized eligibility criteria in making the decision. If an individual meets those particularized standards, H.G. § 7–502 does not confer discretion on the Secretary to deny admission, or to apply additional or alternate eligibility criteria. To the contrary, the statute speaks in mandatory terms: "The Secretary *shall* approve the admission of an individual" who meets

the qualifications for admission. (Emphasis supplied). *See Walzer v. Osborne,* 395 Md. 563, 580, 911 A.2d 427 (2006)(noting that " '[w]hen a legislative body commands that something be done, using words such as 'shall' or 'must,' rather than 'may' or 'should,' we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed.' ") (citations omitted); *Bright v. Unsatisfied Claim and Judgment Fund Bd.,* 275 Md. 165, 169, 338 A.2d 248 (1975) (observing that "ordinarily the word 'shall,' unless the context within which it is used indicates otherwise, is mandatory when used in a statute, and thus denotes an imperative obligation inconsistent with the idea of discretion."); *Comptroller of Maryland v. Miller,* 169 Md.App. 321, 347, 901 A.2d 229 (2006) ("[U]nder settled principles of statutory construction, the word 'shall' is ordinarily presumed to have a mandatory meaning.") (citations omitted).

The use of the word "shall" creates a "legitimate claim of entitlement" as to those individuals who seek admission to a SRC *and* meet the Department's eligibility standards. Because H.G. § 7–502 creates an entitlement to a benefit upon satisfaction of the eligibility criteria, i.e., admission to a SRC, the decision-maker's discretion is constrained by law. It follows that appellant's due process rights were triggered, and she was entitled to a hearing in connection with the Secretary's decision denying the request for admission.

We are mindful of what the Court recently said in *John A., et ux., Next Friends of A.A. v. Board of Education for Howard County,* 400 Md. 363, 388, 929 A.2d 136 (2007):

Subject matter jurisdiction is the court's ability to adjudicate a controversy of a particular kind. *Henderson v. United States,* 517 U.S. 654, 671, 116 S.Ct. 1638, 1647, 134 L.Ed.2d 880 (1996). If, by the law that defines the authority of the court, a judicial body is given the power to render a judgment over that class of cases within which a particular case falls, the court has subject matter jurisdiction. *First Federated Commodity Trust Corp. v. Comm'r of Sec.,* 272 Md. 329, 335, 322 A.2d 539, 543 (1974).

The powers of the OAH and its ALJ's are measured by the granting statute. *Boyd v. Supervisor of Assessments,* 57 Md.App. 603, 608, 471 A.2d 749, 751 (1984). An ALJ cannot enlarge agency jurisdiction, nor may subject matter jurisdiction be conferred upon the agency by the courts or the parties before the OAH. *Boyd,* 57 Md.App. at 608, 471 A.2d at 751–52.[27]

---

**27.** This case is unlike *John A.,* which involved a claim brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 to 1419 (2000 & Supp. IV 2004), and its Maryland counterpart, Md.Code (1978, 2006 Repl.Vol.), §§ 8–401 to 8–417 of the Education Article ("Educ."). *Id.* at 369–70, 929 A.2d 136. In *John A.,* the disabled student's parents filed a request for a statutory due process hearing, as provided by the IDEA and its Maryland counterpart. They asserted that the refusal of the Howard County Public Schools ("HCPS") to administer various medications in accordance with the instructions of the student's doctor constituted a denial of the student's right to a "free appropriate public education" ("FAPE"). They sought an administrative order requiring the HCPS to abide by the doctor's medical directives and administer the medications to the student during the school day. HCPS challenged the ALJ's subject matter jurisdiction to consider the issues presented by the parents. HCPS argued that, under the IDEA and Maryland law, a due process hearing may be conducted only when the dispute pertains to the "identification, evaluation, or placement of the child, or the provision of a free appropriate public education to such child." *Id.* at 378, 929 A.2d 136.

The ALJ was of the view that the issue was one of medical treatment, or an ethical question, rather than a special education one. Therefore, the ALJ determined that the dispute fell outside the scope of the statutory due process hearing, and dismissed the complaint based on lack of subject matter jurisdiction. *Id.* at 380, 929 A.2d 136. The Court of Appeals affirmed.

In rejecting the parents' position, the Court reasoned, *id.* at 390–91, 929 A.2d 136:

We disagree with the parents' contention that the particular dispute in this case sufficiently touches and concerns a "related service" within the contemplation of the regulatory scheme. The dispute in this case is not so much over the administration of medications to a child, which the HCPS concedes is deemed generally a "related service" contemplated by the IDEA, but instead relates to the ability of a child's parents to regulate communications between the school personnel designated to administer the drugs and the child's treating/prescribing psychiatrist. The IDEA does not intend to address claims such as these, even had the ALJ concluded that the administration of medication inferentially was provided for as a "related service" in A.A.'s IEP. The dispute in this case involves a medical treatment issue, not a special education one. As a result, the contro-

Here, the Department clearly has subject matter jurisdiction with regard to the determination of eligibility for admission to SRC. The decision determining that one is qualified for admission is the flip side of a determination that one is not qualified. Yet, the statute only provides a hearing for those who are admitted to a SRC; it does not afford a hearing to those whose request for admission is denied. The Secretary unilaterally determined that Ms. Massa did not meet the statutory criteria for placement in a SRC, and denied her application for admission, without hearing from appellant. While Ms. Massa ultimately may not qualify for placement in a SRC, she does have a legitimate property interest in admission to a SRC, because it is a benefit provided by the State.

---

versy resides outside of the expertise and training of an ALJ who adjudicates disputes regarding the IDEA. Allowing parties to use the IDEA as the mechanism for trying such disputes would open .the doors to lawsuits under the IDEA for a multitude of matters unrelated to the proper scope of special education.

The Court added, *id.* at 391, 929 A.2d 136: "When the issue, as here ... deals principally with medical and ethical concerns, rather than those touching on special education, the IDEA provides no jurisdiction to resolve disputes through the due process complaint process." The Court continued: "The dispute in this case does not touch truly on the provision of the administration of medications as a 'related service,' but is instead about an ethical issue, the need for school nurses to consult directly with prescribing physicians, which is associated only tangentially with a 'related service.' " *Id.* at 393, 929 A.2d 136.

In upholding the ALJ's dismissal of the complaint for lack of subject matter jurisdiction, the Court said, *id.* at 395, 929 A.2d 136:

When, as here, however, the disputed question is a medical or ethical one, and not a special education issue, an ALJ has the power under the IDEA and related Maryland law to dismiss the complaint for lack of subject matter jurisdiction as falling outside his or her power to decide matters "relating to the identification, evaluation, or placement of a disabled child, or the provision of free appropriate public education to such child." The ALJ did not err here in dismissing Appellants' complaint for lack of subject matter jurisdiction.

Notably, the Court observed that " 'redress is available in other forums in disputes of this nature, [but] an administrative special education due process hearing is not the appropriate forum in which to resolve such an issue.' " *Id.* at 394, 929 A.2d 136 (citation omitted.)

In this case, unlike in *John A.*, there was no due process hearing provided to appellant. Instead, as we observed, the Secretary unilaterally decided that Ms. Massa is not eligible for admission to a SRC, and appellant has no statutory recourse to challenge that finding.

Moreover, because the criteria for admission are expressly set forth in the statute, admission does not depend on the exercise of discretion by the Secretary.

Accordingly, appellant was entitled to an opportunity to be heard in connection with her application, by way of a contested case hearing. To the extent that appellant was denied such a hearing, the statute is unconstitutional, because it deprived appellant of procedural due process.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO THE BOARD FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**